

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 2, 2015**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 14-34874-BJH |
| COUTURE HOTEL CORPORATION | § | (Chapter 11) |
| a/k/a HUGH BLACK-ST. MARY | § | |
| ENTERPRISES, INC., | § | Related to ECF Nos. 156 and 261 |
| | § | |
| DEBTOR. | § | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On July 28, 29, 30, and 31, 2015, the Court conducted an evidentiary hearing (the

"**Confirmation Hearing**") to consider both confirmation of the Debtor's Second Amended Plan

of Reorganization [ECF No. 261] (the "**Plan**")[1] filed by Couture Hotel Corporation (the

---

[1] Unless otherwise indicated, all references to the Plan in this Memorandum Opinion and Order shall include the Plan, the modifications to the Plan filed of record [ECF Nos. 308 and 330], and the oral modifications approved by the Court at the Confirmation Hearing. Unless separately defined herein, all capitalized terms used herein shall have the meanings ascribed to them in the Plan.

"**Debtor**") and a motion to lift stay [ECF No. 156, as supplemented by ECF No. 285] (the "**Motion to Lift Stay**") filed by Mansa Capital, LLC ("**Mansa**"). At the conclusion of the Confirmation Hearing, the Court requested briefing from the parties regarding the admissibility of certain expert testimony, which will be discussed below. The last of these briefs was filed on August 12, 2015, and these contested matters are now ripe for ruling. Having considered the Plan, the Debtor's brief in support of the Plan [ECF No. 309] (the "**Debtor's Brief**"), Mansa's objection to confirmation of the Plan [ECF No. 305] (the "**Objection**"), the Motion to Lift Stay and the Debtor's objection thereto, the evidence admitted into the record and the arguments of counsel, and the post-hearing briefs, the Court hereby enters this Memorandum Opinion and Order[2] denying confirmation of the Plan and granting the Motion to Lift Stay should the Debtor fail to timely comply with the requirements set forth at the end of this Memorandum Opinion and Order.

I.      **JURISDICTION AND VENUE**

The United States District Court for the Northern District of Texas has subject matter jurisdiction over the Debtor's bankruptcy case pursuant to 28 U.S.C. § 1334. Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district courts by title 28. Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to the bankruptcy courts for either entry of a final judgment (core proceedings) or proposed findings and conclusions (noncore, related-to proceedings).

---

[2] This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, as incorporated by Fed. R. Bankr. P. 7052.

**MEMORANDUM OPINION AND ORDER**                                                              2

So, as relevant here, this Court exercises authority over the Debtor's Chapter 11 bankruptcy case pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984. Venue is proper with this Court under 28 U.S.C. § 1409. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (L), and (O), while the Motion to Lift Stay is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

## II.   EVIDENTIARY OBJECTIONS

### A.   Mansa's Objection to the Debtor's Methodology for Calculating the Cramdown Interest Rate Under the Plan is Overruled.

Mansa is the sole creditor objecting to confirmation.[3]   Under the Plan, the Debtor proposes to repay Mansa with 59 equal monthly payments, culminating in a balloon payment at month 60.[4]  The monthly payments are to be calculated based upon a 30-year amortization period with a 4.25% interest rate (the "**Cramdown Interest Rate**").

To determine the Cramdown Interest Rate, the Debtor retained Christopher Lucas of ValueScope, Inc. ("**Lucas**") as its testifying expert.[5]  Lucas testified that he utilized the prime-plus formula set forth in *Till v. SCS Credit Corp*., 541 U.S. 465 (2004), as analyzed in *Wells Fargo Bank, N.A. v. Texas Grand Prairie Hotel Realty, L.L.C. (In re Texas Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324 (5th Cir. 2013).  Hr'g Tr. 7/29/15 at 163:20-164:10.  Soon after Lucas took the stand, Mansa's counsel objected to Lucas's testimony, alleging that Lucas had

---

[3]  The relationship between the Debtor and Mansa, both pre- and postpetition, may be kindly described as contentious.  Mansa has fought the Debtor at every turn during the case, objecting multiple times to the Debtor's use of cash collateral, including any use of cash collateral to pay professional fees, and filing the Motion to Lift Stay that was heard in conjunction with the Confirmation Hearing.

[4]  The allowed amount of Mansa's claim will be determined in a separate proceeding.  *See* Debtor's Objection to Proof of Claim No. 31 Filed by Mansa Capital, LLC [ECF No. 210].  For purposes of determining whether the Plan can be confirmed, the Court assumes that Mansa's claim will be allowed, as filed, in the amount of $9,318,664.

[5]  The Debtor's counsel elicited background testimony from Lucas regarding his education and qualifications.  Hr'g Tr. 7/29/15 at 159:13-163:9.  Lucas was not the subject of a *Daubert* challenge, and the Court finds that Lucas is qualified to serve as a testifying expert here.

**MEMORANDUM OPINION AND ORDER**                                                        3

used an improper methodology to determine the Cramdown Interest Rate. The Court permitted the Debtor to continue Lucas's direct examination, and Mansa to cross examine Lucas, subject to Mansa's: (1) pending objection, and (2) oral motion to strike to be made at the conclusion of Lucas's testimony. *Id.* at 171:23-173:25. During both direct and cross examination, Lucas admitted that the national prime rate as of the commencement of the Confirmation Hearing (3.25%) was not his starting point in calculating the Cramdown Interest Rate. *Id.* at 190:22-191:10 (direct); 197:19-210:6 (cross). Instead, Lucas used what he deemed a market-based interest rate as his starting point, which he believes is the proper approach under both *Till* and *Texas Grand Prairie*. *Id.* Mansa's counsel argued that Lucas's use of a market-based interest rate is in direct contrast with *Till* and *Texas Grand Prairie*, and moved to have Lucas's testimony excluded. *Id.* at 211:13-212:19.

Since both parties rely on *Till* and *Texas Grand Prairie* in support of their positions, those cases will be the starting point of the Court's analysis. In *Till*, the Supreme Court addressed the proper methodology for calculating a cramdown rate of interest in the Chapter 13 context. With respect to the auto loan at issue in *Till*, the Supreme Court adopted a prime-plus formula approach, described as follows:

> Taking its cue from ordinary lending practices, the [prime-plus] approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan.

*Till*, 541 U.S. at 479 (footnotes omitted). The *Till* opinion also contains what is referred to as the "efficient markets footnote," which recognizes that the prime-plus formula may not be the

optimal approach in the Chapter 11 context. *Id.* at 476 n.14 ("Thus, when picking a cramdown rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce.").

In *Texas Grand Prairie*, the Fifth Circuit applied the *Till* formula to determine the appropriate cramdown interest rate to be used in a Chapter 11 plan, but specifically acknowledged that it was applying *Till* because the parties stipulated that was the appropriate methodology. *Texas Grand Prairie*, 710 F.3d at 327. The Fifth Circuit, however, explicitly stated that it was not adopting *Till* in the Chapter 11 context. *Id.* at 337 ("However, we do not suggest that the prime-plus formula is the only – or even the optimal – method for calculating the Chapter 11 cramdown rate."). Instead, the Fifth Circuit reaffirmed its holding in *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997), stating that

> In *T–H New Orleans*, we "[declined] to establish a particular formula for determining an appropriate cramdown interest rate" under Chapter 11, reviewing the bankruptcy court's entire § 1129(b) analysis for clear error. We reasoned that it would be imprudent to "tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate."

*Id.* at 330 (footnotes and internal citations omitted).

With this background in mind, the Court will turn to Lucas's testimony and his methodology, which he testified complies with his analysis and understanding of both *Till* and *Texas Grand Prairie*, to wit:

> So the key documents that I reviewed were the Debtor's plan and disclosure statements, including the exhibits to the disclosure statement. To understand Mansa's position, I reviewed their motion to lift the automatic stay. I went – I read both the *Till* and *Texas Grand Prairie* decisions and analyzed the Debtor from the five different points that are enumerated in *Texas Grand Prairie*, including the quality of management; the owner's commitment to the business; the Debtor's health, and I can't remember the rest of that description; the quality of the collateral; and then also the feasibility and duration of the plan. And then finally, I looked at current market interest rates and made adjustments to current – and the

**MEMORANDUM OPINION AND ORDER** 5

current market interest rates on hotel loans, and then made adjustments to those based on my assessments of the five character – or the five characteristics described in *Texas Grand Prairie*.

Hr'g Tr. 7/29/15 at 163:20-164:10. Although Lucas testified that he did not believe an efficient market existed for the loan at issue in the Plan, he nonetheless looked to what he considered comparable loans to estimate the current market rate for hotel loans. *Id.* at 209:23-24. To do so, Lucas visited the websites for Commercial Loans Direct and United Financial Group to view the offered rates on hotel loans with a similar loan-to-value ratio. *Id.* at 190:22-191:10.

Thus, as opposed to beginning with the current prime rate of 3.25% and making adjustments based upon the *Texas Grand Prairie* factors, Lucas began with base rates that he testified account for the industry risk associated with hotel lending: 4.19% (based upon information obtained from Commercial Loans Direct) and 4.3% (based upon information obtained from United Financial Group). *Id.* at 190:18-191:10; 194:15-23; 198:3-16. Lucas then adjusted each of those rates based upon his analysis of the *Texas Grand Prairie* factors.

Although the Court agrees with Mansa that Lucas's methodology is not in strict compliance with *Till*, *Texas Grand Prairie* clarified that *Till* is merely instructive in determining cramdown rates in the Chapter 11 context. Moreover, in contrast to *Texas Grand Prairie*, the parties here have not stipulated that a strict, prime-plus formula should be used. Indeed, although both experts rely on *Till* and *Texas Grand Prairie*, they interpret and apply the cases differently. Thus, under binding Fifth Circuit precedent, this Court is not required to follow a formulaic prime-plus approach when evaluating the Cramdown Interest Rate. *Texas Grand Prairie*, 710 F.2d at 331, 337. Instead, the Court has the discretion to consider additional factors in determining a proper cramdown interest rate, including industry risk.

For these reasons, the Court overrules Mansa's objection and will consider Lucas's testimony about what rate should be set as the Cramdown Interest Rate.

**MEMORANDUM OPINION AND ORDER** 6

## B. The Debtor's Motion to Strike the "Sub-Opinions" Given by Mansa's Expert Witness is Denied.

At the Confirmation Hearing, Mansa called John Keeling of The Keeling Consultancy, LLC ("**Keeling**") to the stand. As reflected in Keeling's appraisal report [Ex. M-29] (the "**Keeling Report**"),[6] he was retained by Mansa's counsel to "form an opinion as to the market value of the fee simple ownership of the Subject Property [the Dallas Hotel, defined in § III.C, *infra*]." Keeling Report at 1. Keeling's ultimate opinion is as follows:

> Based on the facts, assumptions and procedures outlined in this report, it is my opinion that the market value of the fee simple estate as a going concern for the Wyndham Garden Hotel North in Dallas, Texas as of July 1, 2015 is: Eight Million Six Hundred Thousand Dollars ($8,600,000)[.]

*Id*. at 35. Keeling was not the subject of a *Daubert* challenge, and no party has questioned his qualifications or methodology to testify here.

Prior to the Confirmation Hearing, the parties exchanged expert reports. After receiving the Keeling Report, the Debtor informed Mansa that it would agree to stipulate that the current fair market value of the Dallas Hotel is $8.6 million. Mansa, however, chose not to accept that stipulation in lieu of calling Keeling as a witness at the Confirmation Hearing, and instead sought to put on evidence as to the value of the Dallas Hotel, including Keeling's analysis and conclusions.

After Mansa called Keeling to the stand at the Confirmation Hearing, the Debtor objected to Keeling being permitted to testify regarding the predicate opinions and process he utilized to reach his ultimate conclusion of value, arguing that the testimony was irrelevant because it will not have any tendency to make the Dallas Hotel's value more or less probable (as the Debtor had agreed to the $8.6 million value determined by Keeling). *See* Fed. R. Evid. 401. The Debtor

---

[6] The Keeling Report was admitted into evidence for demonstrative purposes by agreement of the parties. Hr'g Tr. 7/30/15 at 14:11-22.

further objected alleging that it was not given notice that Mansa intended to call Keeling to testify regarding the predicate conclusions (or sub-opinions) allegedly contained within the Keeling Report, and that the sub-opinions are not expressed as independent opinions within the Keeling Report.

Mansa countered by arguing that: (1) it never agreed to rely on the Debtor's proposed stipulation to the value of the Dallas Hotel as determined by Keeling, (2) it is entitled to present its case as it sees fit, and (3) Keeling's ultimate conclusion regarding the value of the Dallas Hotel is built upon various sub-opinions, which are relevant both to his ultimate conclusion of value and other confirmation requirements like feasibility of the Plan. In short, Mansa argued that the Court needed to hear Keeling's testimony at the Confirmation Hearing to understand things like the market conditions in which the Dallas Hotel operates and what hotels Keeling believes are a part of its competitive set. And, while those items were considered by Keeling in coming to his ultimate conclusion regarding the current value of the Dallas Hotel, they are also relevant to whether the Plan is feasible. According to Mansa, the Debtor should not be permitted to circumvent Keeling's testimony on these underlying issues by stipulating to Keeling's ultimate conclusion of value.

To clarify this issue, the Court asked Mansa's counsel to identify the sub-opinions that he wanted Keeling to testify to at the Confirmation Hearing, which were delineated as follows (collectively, the "**Sub-Opinions**"):

(1) on a going forward basis, the Dallas Hotel is not going to perform against its competitive set;

(2) the Farmers Branch market, where the Dallas Hotel is located, is declining and that, as a result of the limits on penetration, the Dallas Hotel's value and performance are going to continue to decline;

(3) the rates charged by the Debtor at the Dallas Hotel will lag behind those of its competitive set and be lower than its competition in the marketplace;

(4) the Dallas Hotel's anticipated year of stabilization will be 2018;

(5) there are less than 10 years of economic life remaining for the Dallas Hotel, as configured; and

(6) the value of the Dallas Hotel is declining.

Hr'g Tr. 7/30/15 at 35-38.

With the Sub-Opinions identified, the Court permitted Mansa to elicit Keeling's testimony, and the Debtor to cross examine Keeling, all subject to the Debtor's objection and subsequent oral motion to strike Keeling's testimony. At the conclusion of the Confirmation Hearing, the Court directed the parties to submit post-hearing briefs regarding the admissibility of Keeling's testimony regarding the Sub-Opinions. Each party submitted a brief and a reply brief.

In its post-hearing brief [ECF No. 355] (the "**Debtor's Post-Hearing Brief**"), the Debtor argues that Keeling's testimony regarding the Sub-Opinions should be stricken from the record because it: (1) was not properly disclosed as expert opinion as required by Fed. R. Civ. P. 26(a), (2) is irrelevant due to the Debtor's stipulation regarding the value of the Dallas Hotel and unfairly prejudicial, and (3) is inadmissible hearsay summaries of reports and studies performed by third parties. The Court will address each of the Debtor's arguments, and Mansa's responses thereto, in turn.

### 1. Pursuant to Bankruptcy Rule 9014(c), Mansa was Not Required to Disclose the Sub-Opinions in the Keeling Report.

The Debtor complains that the Sub-Opinions were not sufficiently disclosed in the Keeling Report, in violation of Fed. R. Civ. P. 26(a)(2). Mansa, however, correctly points out that a hearing to consider confirmation of a plan of reorganization is a contested matter, not an adversary proceeding. And, pursuant to Fed. R. Bankr. P. 9014, Rule 26(a)(2) is among the provisions that "shall not apply in a contested matter unless the court directs otherwise." Fed. R.

Bankr. P. 9014(c); *see In re Minh Vu,* 2013 WL 4804822, *12 (D. Md. Sept. 6, 2013), *aff'd*, 556 Fed. Appx. 262 (4th Cir. 2014) (unless the court orders, disclosures under Rule 26(a)(2) are not applicable to contested matters); *In re Atlas Computers, Inc.*, 2012 WL 3018256, *5 (Bankr. N.D. Okla. July 24, 2012), *aff'd*, 2014 WL 1267007 (N.D. Okla. Mar. 26, 2014) (same).

Here, the parties apparently agreed to voluntarily exchange expert reports. Debtor's Post-Hearing Reply Brief [ECF No. 358] ¶ 5. The Debtor argues that this voluntary exchange reflects Mansa's implied agreement to comply with the disclosure requirements of Rule 26(a)(2). *Id.* However, Bankruptcy Rule 9014(c) expressly states that Rule 26(a)(2) shall not apply to contested matters "unless the Court directs otherwise," which it has not, as the parties did not ask the Court to (1) apply Rule 26(a)(2) to this contested Confirmation Hearing, or (2) approve any agreement to do so. Thus, the Court finds and concludes that the parties' voluntary exchange of expert reports is insufficient, standing alone, to overcome application of Bankruptcy Rule 9014(c), and that Mansa was not required to disclose the Sub-Opinions under Rule 26(a)(2).

Undeterred, the Debtor further argues that under Fed. R. Civ. P 37(c), which does apply to contested matters, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) …, the party is not allowed to use that information or witness to supply evidence ... at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c); Fed. R. Bankr. P. 7037. Basically, the Debtor argues that, even if a party is excused from the application of Rule 26(a)(2), it should nonetheless be sanctioned for failing to comply with Rule 26(a)(2).

Mansa disagrees, as does this Court. Rule 37 generally addresses a party's failure to make required disclosures or participate in discovery. *See generally* Fed. R. Civ. P. 37; Fed. R. Bankr. P. 7037. Bankruptcy Rule 9014, however, expressly states that Rule 26(a)(2) does not

apply to a contested proceeding, unless otherwise directed by the Court. Since the Court has not so directed, it finds that Mansa's failure to comply with Rule 26(a)(2) was substantially justified and it will not sanction Mansa by excluding Keeling's testimony.

Finally, it appears that the Debtor had the opportunity to discover the Sub-Opinions when it took Keeling's deposition, which was scheduled. But, the Court understands that the Debtor elected to cancel Keeling's deposition. Thus, it appears that if the Debtor was surprised by the Sub-Opinions, it only has itself to blame.

For all of these reasons, the Debtor's objection is overruled.

### 2. The Relevance of the Sub-Opinions is Not Outweighed by the Risk of Unfair Prejudice.

Under the Federal Rules of Evidence, "[e]vidence is relevant if: (a) if has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. The Debtor argues that the Sub-Opinions are irrelevant because it has stipulated to the value of the Dallas Hotel. And, to the extent the Sub-Opinions are relevant, they should nonetheless be excluded because their value is substantially outweighed by the risk of unfair prejudice. *See* Fed. R. Evid. 403. Mansa counters with the arguments that Keeling's testimony is relevant to matters other than valuation, such as feasibility; and, in any event, this Court should not permit the Debtor to unilaterally "stipulate" how Mansa should be permitted to present its case. Both parties rely on *Old Chief v. United States*, 519 U.S. 172 (1996) in support of their respective positions.

In *Old Chief*, the defendant was convicted of, among other things, being a felon in possession of a firearm. *Id.* at 174. In relation to trial, the defendant offered to stipulate to the fact that he was a convicted felon within the meaning of the relevant statute, but the Assistant U.S. Attorney refused to join in the stipulation, insisting on the government's right to prove the

**MEMORANDUM OPINION AND ORDER** 11

case as it saw fit.  *Id.* at 177.  The district court agreed with the government, and the court records regarding the prior felony conviction were admitted at trial.  *Id.*  On appeal, the Ninth Circuit affirmed, holding that the district court did not abuse its discretion.  *Id.*  The defendant appealed the ruling to the Supreme Court.  *Id.*

On appeal, the Supreme Court acknowledged the general rule that a party has the right to prosecute its case as it sees fit.  *Id.* at 189.  The Court, however, also acknowledged that this rule has "virtually no application when the point at issue is a defendant's legal status, dependent on some judgment rendered wholly and independently of the concrete event of later criminal behavior charged against him."  *Id.*  In *Old Chief*, the defendant fell under the statute by virtue of a past conviction for a qualifying offense, and that was the most the jury needed to know.  *Id.*  In summary, the Court held:

> Given these peculiarities of the element of felony-convict status and of admissions and the like when used to prove it, there is no cognizable difference between the evidentiary significance of an admission and of the legitimately probative component of the official record the prosecution would prefer to place in evidence.  For purposes of the Rule 403 weighing of the probative against the prejudicial, the functions of the competing evidence are distinguishable only by the risk inherent in the one and wholly absent from the other. In this case, as in any other in which the prior conviction is for an offense likely to support conviction on some improper ground, the only reasonable conclusion was that the risk of unfair prejudice did substantially outweigh the discounted probative value of the record of conviction, and it was an abuse of discretion to admit the record when an admission was available.

*Id.* at 191 (footnote omitted).

Here, the Debtor argues that both its offered stipulation of value and the Sub-Opinions lead to the same conclusion – that the Dallas Hotel has a fair market value of $8.6 million as of July 1, 2015;[7] however, only admission of the Sub-Opinions bears the risk of unfair prejudice. Mansa, on the other hand, argues that the Sub-Opinions are clearly distinguishable from the court

---

[7] Keeling Report [Ex. M-29] at 1.

records in *Old Chief* in their proposed use and relevance, and that the general rule regarding a party's right to prosecute its case should apply. As explained below, the Court agrees with Mansa on this point.

The Keeling Report contains facially relevant statements that are potentially harmful to the Debtor's case, not only as to valuation but also as to Plan feasibility.[8] Presumably to alleviate the risk of those statements coming into evidence, the Debtor offered to stipulate to the value of the Dallas Hotel. However, as the Supreme Court recognized, a party has the right within legal bounds to prosecute a case as it sees fit, and Mansa is not required to accept the Debtor's proposed stipulation. *See id.* at 191. Further, the Court agrees that the Debtor's proposed stipulation is not a comparable substitute for the Sub-Opinions, which Mansa seeks to use for purposes beyond valuation. Finally, that the Sub-Opinions may contain statements against the Debtor's interests does not make them unfairly prejudicial. The standard under Fed. R. Evid. 403 is whether the "probative value is substantially outweighed by a danger of … unfair prejudice." Here, it is not. As the Debtor has acknowledged, unlike *Old Chief*, this is a bench trial, and this Court is more than capable of weighing the evidence submitted. *See* Debtor's Post-Hearing Brief [ECF No. 355] ¶ 28 n.23. Thus, the Court finds and concludes that the Sub-Opinions should not be excluded on the grounds of relevance or unfair prejudice. This objection is overruled.

### 3. The Sub-Opinions are Keeling's Expert Opinion.

Finally, the Debtor argues that the Sub-Opinions are not Keeling's expert opinion; instead, they are charts and data derived from third-party sources or, alternatively, mere "stepping stones" used by Keeling to arrive at his ultimate opinion regarding the value of the

---

[8] Indeed, the Debtor posits that Mansa seeks to have the Sub-Opinions admitted into evidence because "[i]n the absence of the 'Sub-Opinion,' Mansa presented little, if any, evidence that the Plan is not feasible." Debtor's Post-Hearing Brief [ECF No. 355] ¶ 29.

**MEMORANDUM OPINION AND ORDER** 13

Dallas Hotel. Debtor's Post-Hearing Brief [ECF No. 355] ¶¶ 10-15, 22. According to the Debtor, for such information to come into the record, it must be independently admissible.

Mansa counters that, although the Sub-Opinions were "certainly derived from hearsay data in the *Hotel Horizons* and *STR* reports, the sub-opinions themselves are the product of Mr. Keeling's expert analysis synthesizing data from the Dallas Hotel, comparing it with similar data relating to the Dallas Hotel's competitive set, and projecting future performance based upon, and informed by, Mr. Keeling's years of experience in the hotel industry." Mansa's Post-Hearing Reply Brief [ECF No. 357] ¶ 13. According to Mansa:

> Mr. Keeling's expert report was no cut and paste job from readily available summaries of the Farmer's Branch hotel market. Instead, Mr. Keeling identified a competitive set of four hotels that would most closely approximate the Dallas Hotel and provide a useful point of comparison for his analysis. Keeling Report at 9. He then calculated the changes in the historical performance of the competitive set to provide a baseline for his analysis. 7/30/15 Hearing Tr. at 61:5-13. Mr. Keeling further testified that he employed an econometric model of the sort regularly relied upon by experts in the hotel industry. 7/30/15 Hearing Tr. at 65:6-18.

*Id.* ¶ 14.

The Court finds Mansa's argument on this point persuasive, as it will now explain.[9] The starting point to analyze the parties' respective arguments is Fed. R. Evid. 703, which states that:

> [a]n expert may base an opinion on facts or data in the case that the experts has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. The purpose of Rule 703 is largely practical – experts generally base their opinions on information which, to be admissible in court, would entail "the expenditure of substantial time in producing and examining various authenticating witnesses." *Factory Mut.*

---

[9] As explained in § IV.B.5, *infra*, notwithstanding the Sub-Opinions, the Plan is feasible.

*Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting Fed. R. Evid. 703, advisory committee's note). "Because experts may use their past experience and professional judgment to make critical decisions on the basis of such information outside of court, Rule 703 was intended 'to bring the judicial practice into line with the practice of the experts themselves when not in court.' " *Id*. at 524 (quoting Fed. R. Evid. 703, advisory committee's note). Courts nevertheless must serve a gate-keeping function with respect to Rule 703 opinions to ensure "the expert isn't being used as a vehicle for circumventing the rules of evidence." *Id*. (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir.1992)). Further, the Fifth Circuit has made clear that "[a]n expert is permitted to disclose hearsay for the limited purpose of explaining the basis of his expert opinion, Fed. R. Evid. 703, but not as general proof of the truth of the underlying matter, Fed. R. Evid. 802." *Fox v. Taylor Diving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983).

It appears to the Court that the Debtor is confusing the information underlying the Sub-Opinions and the Sub-Opinions themselves. For example, in support of Keeling's testimony regarding Sub-Opinions (1) through (3),[10] Mansa directs the Court to the Keeling Report at page 15, the chart titled "Historic & Projected Penetration," and to the chart on page 16, titled "Historic and Projected Average Rate Penetration." Mansa's Post-Hearing Brief [ECF No. 354] ¶ 2. Each chart summarizes information obtained from third party sources regarding the Dallas Hotel and the competitive set of hotels. Hr'g Tr. 7/30/15 at 64:22-75:18. Because of this, the Debtor complains that the charts and data are not Keeling's expert opinion, but inadmissible hearsay. Debtor's Post-Hearing Brief [ECF No. 355] ¶¶ 10-12. Mansa, though, has not sought

---

[10] Sub-Opinions (1) through (3) are that: (1) on a going forward basis, the Dallas Hotel is not going to perform against its competitive set; (2) the Farmers Branch market, where the Dallas Hotel is located, is declining and that, as a result of the limits on penetration, the Dallas Hotel's value and performance are going to continue to decline; and (3) the rates charged by the Debtor at the Dallas Hotel will lag behind those of the competitive set and be lower than its competition in the marketplace.

**MEMORANDUM OPINION AND ORDER**                                                                 15

to admit the charts and data into the record for the truth of the matter asserted. Instead, it seeks to admit Keeling's testimony regarding Sub-Opinions (1) through (3), which is based upon the charts and data at issue. Keeling's reliance on information obtained from third parties when forming his expert opinion is clearly contemplated by Fed. R. Evid. 703, and there was no objection that the information Keeling relied upon was not the type reasonably relied upon by experts in his field. *See* Fed. R. Evid. 703. Accordingly, the Court overrules the Debtor's objection, finding that Sub-Opinions (1) through (3) are admissible expert testimony.

As to Sub-Opinion (4),[11] the Debtor argues that setting the Dallas Hotel's stabilization date is merely a stepping stone to Keeling's ultimate opinion regarding the value of the Dallas Hotel. Debtor's Post-Hearing Brief [ECF No. 355]. at ¶ 13. Based upon the record before it, however, the Court finds that Keeling's testimony regarding the Dallas Hotel's stabilization date was derived from his independent analysis. Accordingly, the Court overrules the Debtor's objection to Keeling's testimony regarding Sub-Opinion (4), finding the testimony is proper expert opinion.

As to Sub-Opinion (5),[12] the Debtor argues that Keeling's testimony is "merely an assumption used to make a calculation" rather than expert opinion. Debtor's Post-Hearing Brief [ECF No. 355] ¶ 14. The Court, however, disagrees. The Keeling Report discusses the Dallas Hotel's remaining useful life on pages 30-32, where it discloses the basis for Keeling's opinion that the Dallas Hotel had less than 10 years of remaining economic life. The Court finds that this is admissible expert testimony, and overrules the Debtor's objection.

---

[11] Sub-Opinion (4) is that the Dallas Hotel's anticipated year of stabilization will be 2018.

[12] Sub-Opinion (5) is that there are less than 10 years of economic life remaining for the Dallas Hotel, as configured.

As to the final Sub-Opinion,[13] the Debtor argues that "nowhere in the Keeling Report does Mr. Keeling say either (a) the value of the Dallas Hotel is declining, or (b) that the value of the Dallas Hotel will be a certain amount in the future that is less than the $8.6 Million on July 1, 2015." Debtor's Post-Hearing Brief [ECF No. 355] ¶ 15. The Court agrees that the Keeling Report fails to quantify the alleged decline in the value of the Dallas Hotel; however the report does contain information and assumptions regarding the future value of the Dallas Hotel upon which Keeling bases his opinion that the value of the Dallas Hotel will decline. Although Keeling's failure to quantify this decline makes his opinion of limited value, the Court nonetheless finds that his testimony is proper expert testimony, and overrules the Debtor's objection.

## III.    FACTUAL AND PROCEDURAL HISTORY

The Debtor is a closely-held Montana corporation headquartered in Dallas, Texas that currently owns and operates two hotels: (1) a limited-service hotel located in Corpus Christi, Texas that is currently operated as a Howard Johnson (the "**Corpus Hotel**"), and (2) a full-service hotel located in Dallas, Texas that is currently operated as a Wyndham Garden Inn (the "**Dallas Hotel**" and, together, the "**Hotels**"). The Debtor's stock is held by two individuals: John Blomfield ("**Blomfield**") and Shelby Weaver ("**Weaver**"). Blomfield, a 70% shareholder, serves as the Debtor's Secretary and Treasurer. He resides at the Dallas Hotel and is involved in the day-to-day management of the Hotels. Weaver, a 30% shareholder, serves as the Debtor's President. She assists with the Debtor's accounting and bookkeeping functions, which she mainly performs from Anchorage, Alaska, with periodic visits to Dallas. Brittany Blomfield ("**Brittany**"), Blomfield's daughter, is the Debtor's Vice President.

---

[13] Sub-Opinion (6) is that the value of the Dallas Hotel is declining.

The Debtor began its operations approximately 60 years ago with the ownership of a few cabins located at the entrance to Glacier National Park. Hugh Black, the forest ranger who started the Debtor, grew the company such that, by 2007, the Debtor owned a number of other real estate projects, including a 125 room resort. Blomfield, along with a partner, purchased the Debtor's stock in 2008, and ultimately sold the Montana assets in 2011. Thereafter, the Debtor purchased and remodeled various hotel properties that, as of the Petition Date, consisted of: (1) a 110 room hotel in Las Vegas, Nevada operating as a Howard Johnson (the "**Las Vegas HoJo Hotel**"), (2) a 121 room hotel in Las Vegas, Nevada that was previously operating as a ValuePlace Hotel, but subsequently operated as an independent hotel (the "**Las Vegas VP Hotel**" and, together with the Las Vegas HoJo Hotel, the "**Las Vegas Hotels**"), (3) the Corpus Hotel, and (4) the Dallas Hotel.

A. **The Las Vegas Hotels**

In September 2011, the Debtor entered into a number of loan documents with Armed Forces Bank, N.A. ("**AFB**") in conjunction with the purchase of the Las Vegas Hotels. The Debtor defaulted on the AFB loan, and AFB sought appointment of a state court receiver. AFB's request was granted, and by order of the District Court of Clark County, Nevada, dated September 10, 2014, Smiling Hospitality Inc. was appointed as receiver (the "**Receiver**"). After its appointment, the Receiver prepared its Initial Report regarding the Las Vegas Hotels, which was admitted into evidence at the Confirmation Hearing [Ex. D-22] (the "**Receiver's Report**"). Ultimately, the Debtor and AFB reached an agreement regarding the Las Vegas Hotels, which resulted in AFB submitting a credit bid for the Las Vegas Hotels in the full amount of its claim against the Debtor. *See* Order Approving Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019 and Agreement Related to Stay with Respect to Las Vegas Hotels Pursuant to Federal Rule of Bankruptcy Procedure 4001(d) [ECF No. 163]. As reflected in stipulations filed

with the Court [ECF Nos. 298 and 317], the Debtor reached agreement with each of Howard Johnson International, Inc. ("**HoJo**") and Value Place Franchise Services LLC ("**Value Place**") regarding the treatment of their respective claims under the Plan, and the resolution of Value Place's objection to confirmation.

### B.      The Corpus Hotel

In June 2013, the Debtor entered into a Promissory Note and Loan Agreement (the "**Ability Note**") executed in favor of Southwest Guaranty Mortgage Corp., which was immediately transferred to Ability Insurance Company ("**Ability**") in the original amount of $3,200,000.00.  In order to secure the obligations under the Ability Note, the Debtor executed, among other things, a Deed of Trust, Assignment of Rents, and Security Agreement, which granted Ability security interests in the real property and personal property of the Corpus Hotel. The Debtor and Ability reached agreement regarding Ability's treatment under the Plan, which is set forth in Class 4.  *See* Plan § 5.8.  Further, as reflected in the stipulation on file with the Court [ECF No. 298], the Debtor and the Corpus Hotel's franchisor, HoJo, reached agreement with respect to the treatment of HoJo's claims under the Plan.

### C.      The Dallas Hotel

After purchasing the Dallas Hotel, the Debtor took steps to brand it as a Wyndham Night Hotel.  In order to facilitate the associated renovation and construction, the Debtor entered into a loan agreement with Mansa.  The documents associated with this loan include: (1) a Loan Agreement dated July 3, 2013 between the Debtor, as borrower, Blomfield and Weaver, as guarantors, and Mansa, as lender, in the original principal amount of $8,870,000 [Ex. M-3] (the "**Mansa Note**"), (2) a Deed of Trust, Assignment of Rents, and Security Agreement dated July 3, 2013 securing the Debtor's obligations under the Mansa Note [Ex. M-4], (3) an All-Assets Security Agreement dated July 3, 2013 between the Debtor, as borrower, Blomfield and Weaver,

as guarantors, and Mansa, as lender [Ex. M-5] (the "**All-Asset Security Agreement**"), (4) a Continuing Guaranty executed by each of Blomfield and Weaver [Exs. M-10 and M-11, respectively] (the "**Guarantees**"), and (5) a Non-Competition Agreement dated July 5, 2015 executed by Mansa in favor of the Debtor [Ex. M-12] (the "**Non-Competition Agreement**" and, collectively, the "**Mansa Loan Documents**").

The Night brand was ultimately an unsuccessful concept, and the Debtor worked with Wyndham Hotels and Resorts, LLC ("**WHR**") to convert the Dallas Hotel from a Night Hotel to a Wyndham Garden Inn. The conversion and various other issues, including significant personal tragedies in Blomfield's life, a depressed economic environment, and a major freeway-construction project in front of the Dallas Hotel, caused the Debtor to experience financial difficulties. Mansa ultimately declared a default under the Mansa Loan Documents and posted the Dallas Hotel for foreclosure. The Debtor filed a Voluntary Petition for relief under Chapter 11 of the Bankruptcy Code on October 7, 2014 (the "**Petition Date**") to prevent Mansa's foreclosure. As reflected in the stipulation on file with the Court [ECF No. 298], the Debtor and WHR have reached agreement regarding WHR's treatment under the Plan.

### D. The Cash Collateral Orders

The Court entered multiple interim cash collateral orders in the Debtor's bankruptcy case, culminating in the Amended Final Cash Collateral Order entered on December 8, 2014 [Ex. D-16] (the "**Final Cash Collateral Order**"). The Final Cash Collateral Order acknowledged that Mansa asserted liens and security interests on the Debtor's cash and the cash proceeds of Mansa's collateral, *id.* at 4, and granted Mansa replacement liens on the same types of collateral and in the same priority that it held as of the Petition Date, *id.* at 8. Although the Debtor did not then-stipulate to the validity of Mansa's alleged liens and security interests, the Final Cash Collateral Order established a January 4, 2015 deadline by which parties were required to object

to Mansa's liens. That deadline passed without objection; thus, Mansa holds a valid and perfected security interest in, among other assets, the cash that will be on deposit in the Debtor's operating accounts on the Effective Date of the Plan,[14] and which the Debtor proposes to use to fund payments under the Plan.

### E. The Plan, Ballots, and Objections to Confirmation

The Plan contains the following classes of claims:

| Class | Class Description |
|---|---|
| Class 1 | The Plan does not contain a Class 1. |
| Class 2.1 | Secured Claims of Propel Financial Services, LLC – Arising from Propel's payment of prepetition ad valorem tax claims against the Corpus Hotel. |
| Class 2.2 | Secured Claims of Propel Financial Services, LLC – Arising from Propel's payment of prepetition ad valorem tax claims against the Dallas Hotel. |
| Class 2.3 | Secured Claims of Propel Financial Services, LLC – Arising from Propel's purchase of the 2014 ad valorem tax claims against the Corpus Hotel. |
| Class 2.4 | Secured Claims of Propel Financial Services, LLC – Arising from Propel's purchase of the 2014 ad valorem tax claims against the Dallas Hotel. |
| Class 3 | Secured Claims of Ford Motor Credit Company LLC |
| Class 4 | Secured Claims of Ability Insurance Company |
| Class 5 | Secured Claims of Mansa Capital, LLC |
| Class 6.1 | Secured Claim of Shaun Collins (M&M lien claimant) |
| Class 6.2 | Secured Claim of Sherwin Williams Company (M&M lien claimant) |
| Class 7.1 | Unsecured Claims of HoJo |
| Class 7.2 | Unsecured Claims of WHR Related to Cure Claim |
| Class 7.3 | Unsecured Claims of WHR Related to Notes |
| Class 8 | Administrative Convenience Claims |
| Class 9 | General Unsecured Claims |
| Class 10 | Subordinated Claims of Insiders |

---

[14] The Plan defines the Effective Date as: "The first Business Day on which all of the conditions precedent to the Effective Date specified in Section 6.15 hereof shall have been satisfied or waived as provided in Section 6.17 hereof, provided, however, that if such conditions precedent have been so satisfied or waived, but a stay, injunction or similar prohibition of the Confirmation Order is in effect, then the Effective Date shall be the first Business Day after such stay, injunction or similar prohibition is no longer in effect as long as the conditions precedent continue to be satisfied or waived." Plan § 2.2.50.

| Class | Class Description |
|-------|-------------------|
| Class 11 | Equity Interests |

The Plan proposes to pay Classes 2 through 9 in full with interest, over a period of between the Effective Date and 60 months post-Effective Date, depending upon the class at issue. The Class 10 subordinated claims, which are held by Blomfield, Weaver, and Brittany, are fully subordinated to payment in full of all other claims. Class 11 equity interests will retain their interests in the Debtor; however, they are not entitled to any distributions on account of their interests until all claims have been paid in full under the Plan.

As reflected in the Declaration of Sandra Meiners, Balloting Agent [ECF No. 313], Classes 2.1, 2.2, 4, 6.1, 6.2, 7.1, 7.2, 7.3, 8, and 10 voted in favor of the Plan. Class 3 (Ford Motor Credit Company LLC ("**Ford**")) and Class 9 (General Unsecured Claims) initially voted against the Plan. No qualifying votes were received in Classes 2.3 (Propel Financial Services, LLC ("**Propel**")), 2.4 (Propel), and 5 (Mansa). Although Mansa attempted to cast votes in Classes 5 and 9, its Proof of Claim was subject to a pending objection by the Debtor. And, because Mansa did not file a motion requesting that the Court temporarily allow its claim for voting purposes, its votes were not counted.

During the Confirmation Hearing, the Debtor filed a motion [ECF No. 335] requesting authority for Ford (Class 3) and Value Place (Class 9) to change their respective votes to accept the Plan based upon agreements reflected in two written Plan modifications [ECF Nos. 308 and 330] (the "**Plan Modifications**"), which was granted without objection. Thus, by the conclusion of the Confirmation Hearing, all eligible voting classes had voted in favor of the Plan.

Ford [ECF No. 283], Value Place [ECF No. 290], various taxing authorities [ECF No. 291], Oracle America, Inc. [ECF No. 292], and Mansa [ECF No. 305] objected to confirmation of the Plan. Although the Debtor was able to reach consensual resolutions of their respective

objections with all other parties, it has been unable to do so with Mansa, which objected to confirmation on the grounds that the Plan: (1) provides disparate treatment to similarly situated creditors in violation of 11 U.S.C. § 1122 and/or §1123(a)(4); (2) was not proposed in good faith, in violation of § 1129(a)(3); (3) is not in the best interests of creditors, in violation of §1129(a)(7); (4) is not feasible, in violation of § 1129(a)(11); and (5) discriminates unfairly and is not fair and equitable with respect to Mansa's claim, in violation of § 1129(b)(2).

With this background in mind, the Court will now turn its analysis to whether the Plan satisfies all of the requirements for confirmation.

## IV.    REQUIREMENTS FOR PLAN CONFIRMATION

### A.    The Plan Modifications

After the Plan voting deadline passed, the Debtor made multiple written and oral modifications to the Plan that the Court must consider.  In this regard, Bankruptcy Rule 3019 provides that:

> In a … chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

With the exception of the proposed subordination of Brittany's claim (explained below), each written Plan Modification reflects agreements reached between the Debtor and individual creditors that do not adversely change the treatment of any creditor or interest holder who has not accepted the modification.  Thus, other than Britany, all creditors and interest holders are deemed to have accepted the Plan Modifications.  The proposed subordination of Brittany's claim, however, is problematic – at least on the record made at the Confirmation Hearing.

The Second Plan Modification amended the Plan so that Class 10 insider claims are fully subordinated to payment in full of all other creditors. After the modification docketed, a notice was filed on behalf of Blomfield and Weaver [ECF No. 339] indicating their acceptance of the modified treatment. Class 10, however, also includes Brittany, and a review of the Debtor's Schedule E [Ex. D-13, page 13 of 47] reflects that Brittany holds a priority unsecured claim of $11,800. Brittany, however, was not included in the Notice filed on behalf of Blomfield and Weaver accepting the proposed modified treatment, and there is nothing in the record indicating that she has agreed to fully subordinate her claim to all other creditors. Thus, the Second Plan Modification does not comply with the requirements of Bankruptcy Rule 3019 as to Brittany.

In addition to the written Plan Modifications, the Debtor also made an oral Plan modification at the Confirmation hearing to address Mansa's objection that the Plan failed to meet the requirements of 11 U.S.C. § 1129(a)(5)(B) (the "**Oral Modification**").[15] More specifically, Mansa objected that, although Plan § 6.1(d) discloses that Blomfield will continue with the Debtor postpetition and receive a Management Fee if the Debtor is current on Plan obligations, the Plan fails to disclose that Weaver will continue as the Debtor's President, that Brittany will continue as the Debtor's Vice President, and the compensation to be paid to those two individuals. In response, the Debtor made an oral motion to modify the Plan to include the disclosures necessary to comply with § 1129(a)(5)(B), namely that Weaver and Brittany will continue in their positions with the Debtor; however, neither will be compensated by the Debtor directly.[16] Although Mansa initially objected to the Oral Modification, it ultimately withdrew the objection. Hr'g Tr. 7/31/15 at 164:12-20.

---

[15] Section 1129(a)(5)(B) requires that "the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider."

[16] Any compensation paid to Weaver and/or Brittany will come from the management fee paid by the Debtor to Blomfield. Hr'g Tr. 7/30/15 at 119:5-7.

Thus, with the exception of the proposed subordination of Brittany's claim, the Court finds and concludes that the Written Modifications and the Oral Modification meet the requirements of Bankruptcy Rule 3019, and do not require additional disclosure under 11 U.S.C. § 1125 or re-solicitation of votes under 11 U.S.C. § 1126, nor do the modifications require that holders of claims or equity interests be afforded an opportunity to change previously cast votes.

**B.      Analysis of the Contested Confirmation Requirements Under 11 U.S.C. § 1129.**

To confirm the Plan, the Debtor must also demonstrate that the Plan satisfies the applicable provisions of 11 U.S.C. § 1129 by a preponderance of the evidence. *T-H New Orleans*, 116 F.3d at 801. If all of the requirements of § 1129(a) are met, with the exception of subsection (a)(8), the Court may confirm the Plan if the requirements of 11 U.S.C. § 1129(b) are satisfied. Since Mansa has objected to the Plan on limited grounds, the Court will limit its written analysis in this Memorandum Opinion and Order to: (1) the contested confirmation requirements, and (2) the confirmation requirements that the Plan failed to meet based upon the Court's independent review of the Plan.[17] *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010).

**1.      The Plan Complies with the Requirements of 11 U.S.C. § 1129(a)(1).**

A principal objective of § 1129(a)(1) is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization. *In re Mirant Corp.*, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007). Accordingly, to determine whether the Plan complies with § 1129(a)(1), the Court must analyze

---

[17] The Court has reviewed the Plan and finds and concludes that the Plan meets all applicable requirements for confirmation set forth in the Bankruptcy Code and Rules, with the limited exceptions expressly addressed in this Memorandum Opinion and Order.

11 U.S.C. §§ 1122 and 1123(a). As discussed in more detail below, the Plan meets the requirements of these sections.

Section 1122 requires that all claims placed in the same class be substantially similar to one another, but does not require that all substantially similar claims be placed in the same class. *See Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (Matter of Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991). The Fifth Circuit has recognized that, under § 1122, a plan proponent has broad discretion to place similar claims into different classes, provided there is a good business reason to do so other than the motivation to secure the vote of an impaired, assenting class of claims. *Id.* In turn, § 1123(a)(4) requires a Plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

In the Objection, Mansa appears[18] to object to the Plan on the grounds that it is similarly situated with other secured creditors, namely Ability[19] and Propel,[20] yet it is separately classified and treated differently. For example, Mansa complains that Ability, who holds a $3,685,740.51 claim secured by the Corpus Hotel, is classified in Class 4 and is being paid over three years based on a 25-year amortization, yet Mansa, who has filed a $9,318,664 claim secured by the Dallas Hotel, is classified in Class 5 and is being paid over five years[21] based on a 30-year amortization. Mansa makes the same argument with respect to Propel, the creditor that holds various secured tax claims and whose lien primes the lien of Ability on the Corpus Hotel and

---

[18] Mansa does not cite a section of the Bankruptcy Code with respect to this objection. Thus, the Court will analyze it under both § 1122 and § 1123(a)(4).

[19] Ability is the secured lender holding a first priority lien on the Corpus Hotel, subordinate only to Propel.

[20] Propel has purchased various pre-and postpetition claims of ad valorem taxing authorities and holds first priority liens on the Dallas Hotel and the Corpus Hotel.

[21] The Objection references a seven-year payout; however, the Plan was subsequently modified to reduce the payment term to five years.

Mansa on the Dallas Hotel.  Mansa's objection lacks merit and is overruled for the reasons explained below.

As recognized by the Fifth Circuit, "substantially similar claims" are "those which share common priority and rights against the debtor's estate."  *See Greystone,* 995 F.2d at 1278.  Here, each of the secured creditor's respective rights arose under separate loan documents or by statute.  Each creditor enjoys different legal rights and priorities in varying collateral.  Although the secured creditors here share some collateral (with different priorities in that collateral), the Court concludes that: (1) this is an insufficient reason to find Mansa similarly situated to Ability and/or Propel, and (2) the Plan has properly classified Mansa separate and apart from Ability and/or Propel.

As noted previously, Ability has the first lien on the Corpus Hotel, although its first lien has been primed by the tax claims now held by Propel, and Mansa has the first lien on the Dallas Hotel, although its first lien has been primed by the tax claims now held by Propel.  Mansa has a second lien on the personal property at the Corpus Hotel, although that property has de minimis value.  Generally, secured creditors with liens on different collateral or of different priority on the same collateral are separately classified.  *See In re Cypresswood Land Partners, I,* 409 B.R. 396, 435 (Bankr. S.D. Tex. 2009) ("[S]ecured creditors can, and usually must, be classified separately because each creditor has unique collateral, requires different monthly payments, and charges different interest rates  This is because they have different legal rights to their respective collateral.") (internal quotations omitted); *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("Unlike unsecured claims, every secured claim is different. Secured claims usually are secured by different collateral and usually have different priorities even if

secured by the same collateral. This fact leads to the permissibility of individualized treatment based on the particularities of each secured claim.").

Thus, Mansa is properly classified in Class 5, while Ability is properly classified in Class 4 and Propel is properly classified in Class 2. Because Mansa is the sole creditor in Class 5, the Plan also satisfies the requirements of § 1123(a)(4). For these reasons, the Plan complies with the requirements of § 1129(a)(1). Mansa's objection is overruled.

### 2. The Plan was Proposed in Good Faith and Complies with the Requirements of 11 U.S.C. § 1129(a)(3).

The Fifth Circuit has stated that good faith under §1129(a)(3) "should be evaluated 'in light of the totality of the circumstances surrounding establishment of [the] plan,' mindful of the purposes underlying the Bankruptcy Code." *See Western Real Estate Equities, L.L.C. v. Village at Camp Bowie I, L.P. (In re Village at Camp Bowie I, L.P.)*, 710 F.3d 239, 246 (5th Cir. 2013) (quoting *In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 519 (5th Cir. 1988)). With this guidance in mind, the Court turns to the Objection, which couches the majority of its complaints under the ambit of lack of good faith. *See generally* Objection [ECF No. 305] ¶¶ 19-30.[22]

This Memorandum Opinion and Order discusses each objection under the relevant Code section; however, it notes the objections here so that it may find that, having examined the totality of the circumstances surrounding the Plan, the Plan was proposed in good faith and not by any means forbidden by law, thereby satisfying § 1129(a)(3). The record makes it abundantly clear that the Debtor and its principals have worked diligently with creditors in the hopes of

---

[22] Three of Mansa's objections may be overruled summarily. First, in the Objection and the Motion to Lift Stay, Mansa alleges that the Debtor obtained an unauthorized postpetition loan from Propel to pay 2014 ad valorem taxes. The evidence, however, showed that Propel purchased the claims from various taxing authorities; there was no loan. Hr'g Tr. 7/28/15 at 95:24-96:24. Next, Mansa alleges that the Cramdown Interest Rate, in and of itself, evidences a lack of good faith. As discussed in § II.A, *supra*, the Debtor used an appropriate methodology in determining the rate, alleviating any concerns that the Debtor was not acting in good faith. Finally, the Objection complains that insider claims will be paid in full prior to Mansa. The modified Plan, however, subordinates insider claims to payment in full of all other claims.

reaching a consensual resolution to this case. And, with the sole exception of Mansa, the Debtor has reached that goal.

Moreover, the Plan seeks to achieve the rehabilitative and reorganizational goals of the Bankruptcy Code by restructuring the Debtor's obligations and providing the means through which the Debtor may continue to operate as a viable enterprise. Attendant to the continued operation of the enterprise is the Debtor's ability to preserve jobs and continue business operations, all while seeking to pay creditors in full, with interest.

Overall, the Plan is the result of arm's length discussions and negotiations among the Debtor, Ability, Propel, the various hotel franchisors, taxing authorities, the Debtor's shareholders, and other creditors. The Plan, with its compromises and proposed treatments, clearly promotes the objectives and purposes of the Bankruptcy Code and is being proposed in good faith. Mansa's objection is overruled.

### 3. The Plan, as Modified, Complies with 11 U.S.C. § 1129(a)(5).

Section 1129(a)(5) requires that the plan proponent disclose the identity and affiliations of the proposed officers, directors, or voting trustee of the debtor after confirmation of the plan; that the appointment or continuance of such officers, directors, or voting trustee be consistent with the interests of creditors and equity interest holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. The Plan, based on the Oral Modification, complies with these requirements.

Post-confirmation, Blomfield shall continue as the Reorganized Debtor's Secretary and Treasurer, while continuing to oversee management of the Hotels; Weaver shall continue as the Reorganized Debtor's President and to provide accounting and bookkeeping services; and Brittany shall continue as the Reorganized Debtor's Vice President. Any compensation paid to

these individuals will be in accordance with §§ 6.4 and 6.5 of the Plan and be subsumed within the Management Fee. Thus, the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(5). Mansa's objection is overruled.

### 4. The Plan Complies with the Requirements of 11 U.S.C. § 1129(a)(7), the So-Called "Best Interests of Creditors" Test.

Pursuant to 11 U.S.C. § 1129(a)(7),[23] "[a] reorganization plan must either be accepted by each creditor or satisfy the Code's 'best interests of the creditor' rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of chapter 7 liquidation." *In re Cantu*, 784 F.3d 253, 262 (5th Cir. 2015). Citing to § 1129(a)(7), Mansa objects to the Plan alleging that creditors would receive more "up front" in a Chapter 7 liquidation than they would under the Plan. In support of its argument, Mansa alleges that: "upon a liquidation, $1,054,883.60[[24]] would be available to immediately pay all of the Debtor's unsecured creditors (*assuming rejection damages claims and the claims of insiders are excluded from this calculation*) in full and represents a more complete and timely satisfaction of their claims than would occur under the Plan." Objection [ECF No. 305] ¶¶ 31-32 (emphasis added). The flaws in Mansa's objection are self-evident.

---

[23] Pursuant to 11 U.S.C. § 1129(a)(7):

> (7) With respect to each impaired class of claims or interests—
>
> > (A) each holder of a claim or interest of such class—
> >
> > > (i) has accepted the plan; or
> > >
> > > (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or
> >
> > (B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

[24] Non-convenience class general unsecured claims are estimated at approximately $1.2 million.

First, Mansa misstates the best interests of creditors test. It is not whether creditors will receive more "up front" or more overall, but whether creditors will receive at least as much as they would in a chapter 7 liquidation. Here, the Plan seeks to pay all creditors in full with interest, which is all creditors are legally entitled to receive. By definition, the Plan cannot fail the best interests test of § 1129(a)(7).

Second, there is nothing in the Confirmation Hearing record reflecting why rejection damages and insider claims should not be paid on par with other general unsecured claimants, as Mansa suggests in making its more timely payment argument. Of course, if those claims are included, as they must be, Mansa's argument is simply wrong – both legally and factually.

Finally, the Objection overlooks the substantial compromises and settlements reflected in the Plan and the franchisor stipulations that will be lost if the Debtor's assets are liquidated under Chapter 7.

Based on the record before it, the Court finds and concludes that the Plan satisfies 11 U.S.C. § 1129(a)(7). Mansa's objection is overruled.

### 5. The Plan is Feasible and Complies with the Requirements of 11 U.S.C. § 1129(a)(11).

The feasibility test set forth in § 1129(a)(11) requires the Court to determine whether the Plan has a reasonable likelihood of success. As explained by the Fifth Circuit:

> In determining whether a debtor's Chapter 11 plan of reorganization is feasible, we noted in *Briscoe* that "the [bankruptcy] court need not require a guarantee of success ..., [o]nly a reasonable assurance of commercial viability is required." *Id.* at 1165-66; *see also Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2nd Cir. 1988). All the bankruptcy court must find is that the plan offer "a reasonable probability of success." *In re Landing Assoc.*, Ltd., 157 B.R. 791, 820 (Bankr. W.D. Tex. 1993).

*T–H New Orleans*, 116 F.3d at 801; *see In re M & S Assocs.,* 138 B.R. 845, 848–49 (Bankr. N.D. Tex. 1992). To meet this burden, the debtor must present proof through reasonable projections

that there will be sufficient cash flow to fund the plan. Such projections cannot be speculative, conjectural, or unrealistic. *M & S Assocs.*, 138 B.R. at 849. "However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility." *Cajun Elec.*, 230 B.R. at 745.

Courts have considered the following factors in determining whether a plan is feasible: (1) the debtor's capital structure, (2) the earning power of the business, (3) economic conditions, (4) the ability of debtor's management, (5) the probability of continuation of management, and (6) any other related matter. *See, e.g., In re Friendship Dairies*, 2014 WL 29081, *10 (Bankr. N.D. Tex. Jan. 3, 2014). The test is discretionary, and a court may apply or ignore the various factors as it sees fit. *Id.; see, e.g., In re Am. Solar King Corp.,* 90 B.R. 808, 832–33 (Bankr. W.D. Tex. 1988) (finding courts do not need to "check off" factors); *Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.)*, 632 F.3d 168, 173 (5th Cir. 2011) (noting the lower court did not need to analyze each of the six factors in finding the plan infeasible).

The Debtor's projections, which were admitted into evidence as Ex. D-4 (the "**Projections**"), were prepared by Zackary Warren ("**Warren**"), the General Manager of the Dallas Hotel. Warren, who has significant experience in the hotel industry, has worked with the Debtor for approximately two years. As General Manager, Warren oversees the daily operations of the Dallas Hotel, and "slightly oversee[s]" the General Manager of the Corpus Hotel. Hr'g Tr. 7/29/15 at 76:21-25.

Warren also prepared the Debtor's cash collateral budgets during the case. Although there were issues with the Debtor's performance under the November and December 2014 cash collateral budgets, Warren testified that those budgets were inaccurate because, when preparing

them, he relied on revenue numbers supplied by the Dallas Hotel's former General Manager. In hindsight, Warren realized that was a mistake and it caused the Debtor to miss the projections by a material amount. *Id.* at 86:16 – 87:4. Since Warren has corrected that issue, the Debtor has performed to budget, or very close to budget, from January 2015 forward. In fact, Warren testified that for 2015, the Debtor was off by less than 1% of its projected total revenue, *id.* at 97:13-17, and that the Debtor beat its net income from operations projections by 40% for both Hotels combined, *id.* at 92:10-21. Based upon the Debtor's performance compared to its 2015 cash collateral budgets, the Court is confident in both Warren's methodology and his ability to prepare operating budgets and revenue projections for the Hotels. Moreover, the Court found Warren to be a very credible witness; he was candid, forthcoming, and accepted responsibility for prior mistakes and then accounted for those mistakes on a going-forward basis.

Notably, Warren used the same method to prepare the Projections that he used to prepare the highly-accurate 2015 cash collateral budgets. *Id.* at 97:9-10. In summary, Warren and Blomfield reviewed the Hotels' historical performance and the performance of comparable hotels in the market, looking at both income and expenses, then extrapolated future performance. Although this procedure has proven accurate during the case, Warren testified that he nonetheless reduced various income and expense line items in the Projections by approximately 7.5% "to give us a little buffer zone to make sure that [the budgets] were achievable." *Id.* at 97:10-99:6.

Both of Mansa's experts also gave testimony regarding the Plan's feasibility. Notably, Albert Conly of FTI Consulting ("**Conly**") relied on the Projections when preparing his Cramdown Interest Rate analysis, and found the Projections "reasonable and supportable." *See*

Expert Report of Albert S. Conly [Ex. M-27] (the "**Conly Report**")[25] at 5 ("Opinion 3 – The financial projections contained in the disclosure statement filed in connection with the Company's plan, including the underlying assumptions and computations, are reasonable and supportable.").  Although Conly subsequently testified that he did not have time to verify the Projections, Hr'g Tr. 7/30/15 at 175:4-22; 192:19-193:2; 218:4-219:7, the Court finds that his testimony does not reflect on the reliability of the Projections as much as it does on Mansa's apparent decision to wait until the eleventh hour to hire him.  Nor does it explain why Conly's written report would expressly state the Projections are "reasonable and supportable" if he had not had sufficient time to analyze them, casting doubt on the accuracy of the rest of his report and on his oral testimony at the Confirmation Hearing.

Mansa also elicited testimony regarding Plan feasibility from Keeling, its appraisal expert.  Keeling's testimony was comprised of the following six Sub-Opinions (previously discussed in § II.B, *supra*): (1) on a going forward basis, the Dallas Hotel is not going to perform against its competitive set, (2) the Farmers Branch market, where the Dallas Hotel is located, is declining and that, as a result of the limits on penetration, the Dallas Hotel's value and performance are going to continue to decline, (3) the rates charged by the Debtor at the Dallas Hotel will lag behind those of its competitive set and be lower than its competition in the marketplace, (4) the Dallas Hotel's anticipated year of stabilization will be 2018, (5) there are less than 10 years of economic life remaining for the Dallas Hotel, as configured, and (6) the value of the Dallas Hotel is declining.  Although the Court found Keeling to be a credible witness, his testimony in the context of Plan feasibility was unpersuasive.

---

[25] The Conly Report was admitted into evidence for demonstrative purposes by agreement of the parties. Hr'g Tr. 7/30/15 at 159:22-160:5.

**MEMORANDUM OPINION AND ORDER**                                    34

For example, Keeling testified that the value and performance of the Dallas Hotel will decline in the future. *See* Sub-Opinions (1) through (3) and (6). The Confirmation Hearing record, however, contains no credible evidence regarding the materiality of such decline or the effect it will have on the Plan's feasibility. Keeling's failure to quantify the extent of the decline makes his testimony of limited value, and is insufficient to persuade the Court that the Plan is not feasible.

Similarly, Keeling testified that the Dallas Hotel has less than 10 years of economic life remaining, as it is currently configured. *See* Sub-Opinion (5). Undoubtedly, the age and economic life of the Dallas Hotel will be considered by others when the Debtor seeks to refinance or sell the Dallas Hotel to repay Mansa, but there was no evidence adduced at the Confirmation Hearing indicating that the hotel's age or remaining economic life makes the Plan not feasible. Although Keeling did testify that, with a "strong economic downturn," the Dallas Hotel may not be profitable within the 10-year projection period of the Keeling Report,[26] that testimony: (1) assumes a "strong economic downturn," which Keeling did not define and is pure speculation as to whether it will occur, (2) does not consider that the Plan seeks to repay Mansa within five years, and (3) conflicts with Conly's testimony, as explained below.

Conly was retained by Mansa to testify as to the proper Cramdown Interest Rate under the Plan. As part of his analysis, Conly considered the *Till* factors, which include circumstances of the estate, nature of the security, Plan feasibility, and Plan duration. Conly Report [Ex. M-27] at 8; *see* § IV.B.6.a), *infra*. As part of its Plan feasibility analysis, the Conly Report quotes from and relies upon the Keeling Report regarding the Dallas Hotel's physical condition and remaining economic life. *See* Conly Report [Ex. M-27] at 12-15. After specifically considering

---

[26] *See* Hr'g Tr. 7/30/15 at 83:8-11 ("But it's not likely to go much beyond the projection period [of 10 years], and it is possible that with a strong economic downturn sometime in the next ten years it could cease to be competitive to even cover its operating costs during that time.").

the Keeling Report, the Conly Report states that "the [Debtor's] Plan bears moderate feasibility risk, resulting in an additional risk adjustment of 150 to 250 basis points (1.5% to 2.5%) to the Prime Rate." *Id.* at 15. Neither the Keeling Report nor the Conly Report states that the age or remaining economic life of the Dallas Hotel makes the Plan not feasible.

Based upon the record before it, the Court finds that the Projections are reasonable and based upon a sound methodology. Thus, the issue becomes whether the Plan is feasible based on the Projections. For purposes of its feasibility analysis, the Court will consider feasibility at three separate points in time: (1) the Effective Date, (2) during the life of the Plan, and (3) when the proposed balloon payments to Ability and Mansa come due.

First, the Court finds that the Reorganized Debtor will have sufficient means to pay the $572,074 in obligations due on or soon after the Effective Date, as the Debtor projects to have approximately $700,000 of accumulated cash available on the Effective Date. The Court notes, however, that the full $572,074 is not actually due on the Effective Date. For example, that figure includes (1) significant attorneys' fees that will not be due until fee applications are filed and Court approval is received, which is typically 45-60 days post-Effective Date, and (2) $25,682.20 due to Class 6 Claimants and $24,701.03 due to Class 8 Convenience Claims, which are not due until 60 days post-Effective Date. Plan at §§ 5.10, 5.11, and 5.16. Thus, the Reorganized Debtor will have approximately two months of operations between the Effective Date and the date when the last of the "Effective Date" payments are due.

Second, Warren's testimony regarding the Projections, along with the Projections themselves, clearly show that the Reorganized Debtor will have sufficient funds to make the monthly payments due over the life of the Plan. Indeed, as shown by the Projections, the Reorganized Debtor will generate sufficient revenue to make Plan payments from net operating

profits in virtually every month of the Plan.  For the few months where sufficient monthly net revenue will not be generated, the Reorganized Debtor will have accumulated more than sufficient cash reserves to fund the payments.  *See generally* Projections [Ex. D-4].

Finally, the Court must determine whether the Reorganized Debtor will have the ability to either pay or refinance the balloon payments due to Ability at month 36 and Mansa at month 60.  When considering balloon payments proposed under a plan, a court should consider whether the value of the creditor's collateral is sufficient to ensure that its outstanding debt can be satisfied.  *See Geijsel*, 480 B.R. at 260 (citing *Briscoe Enters.*, 994 F.2d at 1169).[27]  In other words, will the Reorganized Debtor will have sufficient equity in the creditor's collateral to attract a re-financier or, if not, whether the Reorganized Debtor can sell some or all of the collateral and pay the debt.  *See T–H New Orleans*, 116 F.3d at 802 ("The Plan included several alternatives which could reasonably result in the full payment of FSA's claim; for example, by refinancing, a balloon payment at the end of twenty-four months, [or] the sale of the Hotel to a third party."); *see also Trenton Ridge*, 461 B.R. at 494 ("[T]he court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded.") (quoting *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 316 (10th Cir. BAP 2006)).  With this precedent in mind, the Court will consider each balloon payment contemplated under the Plan.

---

[27] The court in Briscoe Enterprises stated as follows:

> Heartland [the creditor] and the district court suggest that allowing a balloon payment is unacceptable as there is no immediate indication from where the funds will come to pay off the balloon ... It is reasonable to assume that the property itself will provide the source for the balloon payment. There is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible.

*Briscoe Enters.*, 994 F.2d at 1169.

**MEMORANDUM OPINION AND ORDER**                                                    37

As to Ability, the Plan proposes 35 monthly payments of $19,967.06, with a balloon payment in the 36th month of $3,428,619.09.  Although the Reorganized Debtor will not have sufficient funds to make the Ability balloon payment from excess cash flow, the Confirmation Hearing evidence shows that there will be approximately $2.7 million of equity in the Corpus Hotel as of the Effective Date.  Hr'g Tr. 7/31/15 at 47:3-6.  While no evidence regarding the estimated value of the Corpus Hotel in three years was adduced at the Confirmation Hearing, it is reasonable to infer from the evidentiary record that the Corpus Hotel will not decrease in value. This is particularly true since the undisputed evidence at the Confirmation Hearing shows that the Corpus Hotel is stable and revenues are increasing by approximately 5% per year.  Hr'g Tr. 7/29/15 at 120:9-16.  As such, the Confirmation Hearing record establishes that the Reorganized Debtor has two viable alternatives to satisfy the Ability balloon payment – the Corpus Hotel may either be refinanced or sold.  Thus, the Plan's balloon payment to Ability is feasible.

As to Mansa, Debtor's counsel estimated that, in a "worst case" scenario where Mansa's claim is allowed in full, the balloon payment due at month 60 would be approximately $8,461,561.  Hr'g Tr. 7/31/15 35:16-19 (Mansa's counsel did not object to this estimate).  Under the Plan, this claim will be secured primarily by the Dallas Hotel.  As with the Corpus Hotel, the Confirmation Hearing record contains no evidence regarding the value of the Dallas Hotel in five years.  Although Keeling, Mansa's appraiser, testified that the Dallas Hotel is declining in value, he did not quantify the decline over that time frame.

As additional collateral in support of the Plan, Blomfield has agreed to pledge the Guarantor Joint Proponent Property[28] to Mansa, which Blomfield testified was valued between

---

[28] The Plan defines the Guarantor Joint Proponent Property as "[t]hat certain house and property located in Mexico, with the address Pelicanos 104 Marina Vallarta, Puerto Vallarta, Jalisco 48354."  The Guarantor Joint Proponent Property is subject to a first lien held by Blomfield's ex-wife in the amount of $500,000.  Hr'g Tr. 7/28/15 at 94:21-95:1.

$1.9 million, if liquidated immediately, and $3.5 million, if permitted a one-year marketing period. Mansa argues that, because Blomfield has already pledged this property to Mansa in relation to his Guaranty, this gives Mansa nothing it doesn't already have. However, of note, the Conly Report assigned a value of $1 million to the Guarantor Joint Proponent Property, which the Court finds to be the minimum amount reasonable. *See* Conly Report [Ex. M-27] at 12. Thus, the Plan proposes to provide Mansa with a collateral package valued, in all likelihood, at not less than $9.6 million to secure its approximately $8.5 million balloon payment in month 60.

In addition to the collateral pledged to Mansa, the Debtor will have substantial other assets to assist in funding the Mansa balloon payment at month 60. For example, at the end of five years, the Reorganized Debtor will have substantial equity in the Corpus Hotel (as noted above, it will have $2.7 million in equity as of the Effective Date) or will have cash on hand from the sale of the Corpus Hotel (if the Debtor elected to sell the Corpus Hotel in order to satisfy the Ability balloon payment), as no monies can be paid out of the Debtor to the interest holders until all creditors have been paid under the Plan. Plan [Ex. D-1] § 6.3. And, depending on the Cramdown Interest Rate utilized under the Plan, the Reorganized Debtor will have between $2.5 million (assuming a Cramdown Interest Rate of 9.88%)[29] to $4.5 million (assuming a Cramdown Interest Rate of 4.25%) in accumulated cash at the end of five years. Hr'g Tr. 7/28/15 at 184:4-9; 7/31/15 at 108:14-21.

Overall, the Confirmation Hearing record shows that, at the end of five years, Mansa will be owed a maximum balloon payment of $8,461,561, and will have a collateral package with a value of at least $9.6 million. Even assuming for argument's sake that the value of the Dallas Hotel is declining, the Debtor will have significant equity in the Corpus Hotel (assuming that the

---

[29] The Court requested that, as part of closing arguments, each party estimate the maximum interest rate the Plan could sustain before becoming not feasible. Mansa's counsel advised the Court that an interest rate above 9.88% would render the Plan not feasible based on Conly's analysis of the Projections.

**MEMORANDUM OPINION AND ORDER**                                                          39

Debtor elects to refinance the Ability debt at month 36 of the Plan) and between $2.5 million and $4.5 million in excess cash flow with which to attract a re-financier for the Dallas Hotel. Thus, the Court finds that there is a reasonable likelihood that the Debtor will be able to pay off the balance of the Mansa debt when that debt matures at month 60 of the Plan, and that the Plan, overall, has a reasonable probability of success.

For all of these reasons, the Court finds the Plan feasible and § 1129(a)(11) satisfied. Mansa's objection is overruled.

### 6. The Plan is Fair and Equitable and Complies with the Requirements of 11 U.S.C. § 1129(b)(2).

The Court must also determine whether the Plan's proposed treatment of Mansa's claim is fair and equitable under 11 U.S.C. § 1129(b)(2).[30] The minimal requirements of § 1129(b)(2) are that the secured claimant (1) must retain its lien(s) and be paid the full amount of its claim in deferred cash payments the present value of which must equal the value of its collateral, (2) must be paid from the sale of its collateral, or (3) must realize the indubitable equivalent of its claim. "There is no indication in the statute or the legislative history that the alternative minimal conditions contained in 11 U.S.C. §§ 1129(b)(2)(A)(i), (ii), (iii) are mutually exclusive; that is, that a plan proponent can only choose one of the alternatives with regard to each secured creditor in its plan." *In re Simmons*, 113 B.R. 942, 946 (Bankr. W.D. Tex. 1990); *see also In re Pennave Prop. Assoc.,* 165 B.R. 793 (E.D. Pa. 1994) ("11 U.S.C. § 1129(b)(2)(A) establishes minimal, non-exclusive, requirements that must be met for a plan of reorganization to be considered fair and equitable to a class of secured claims.").

---

[30] In addition to the grounds addressed below, Mansa also alleges that the Plan does not comply with § 1129(b) because the equity holders are retaining their interests without providing new value. Objection [ECF No. 305] ¶¶ 39-41. The Plan, however, proposes to pay all creditors in full, with interest, and the general unsecured class voted in favor of the Plan. Thus, the absolute priority rule is not triggered and the equity holders are not required to infuse new value to retain their interests.

The Plan, as modified by the Second Plan Modification, proposes the following treatment of Mansa's claim:

5.9 Secured Claims of Mansa Capital, LLC. (Class 5) – Class 5 shall consist of all the Claims of Mansa Capital, LLC ("Mansa"), including but not limited to, any and all Claims related to the Secured Promissory Note dated July 3, 2013, any interests and fees related to the promissory note (including any interest that may be disguised in the form of another agreement) and the non-compete agreement dated July 5, 2013 (which the Debtor alleges is not a separate agreement but disguised interest). Mansa shall have an Allowed Secured Claim in an amount determined by the Bankruptcy Court (the "Mansa Claim").[31]

(i) Interest. Interest shall accrue on the Mansa Claim, on and after the Effective Date at the rate of four and one-quarter percent (4.25%) interest per annum.

(ii) Amortization. The Mansa Claim shall be amortized over thirty (30) years, and repaid monthly following the Effective Date.

(iii) Term. The Mansa Claim will be repaid on a term of sixty (60) months such that the Reorganized Debtor shall pay Mansa fifty-nine (59) equal monthly payments of amortized principal and interest, as provided above, with the sixtieth (60th) payment being a balloon payment of Mansa Claim, with then accrued and unpaid interest, then unpaid.

(iv) Commencement. The first principal and interest payment shall be due on the first Business Day of the first month following the expiration of thirty (30) days from the Effective Date, and each successive payment shall be due on the first day of each successive month.

5.9.2 Preservation of Liens. Mansa shall retain all liens, security interests, other interests, and rights in, to, and against all property of the Debtor and the Estate securing the Mansa Claim under the Mansa Loan Documents, including, without limitation: (i) the first priority, perfected, valid and enforceable lien (subject only to priming liens for the benefit of ad valorem tax claims) against the Dallas Hotel and (ii) the perfected, valid and enforceable lien (subject to the first priority lien held by Ability Insurance Company and the any priming liens for the benefit of ad valorem tax claims) against the personal property related to the Corpus Hotel, with all such liens, security interests, other interests and rights surviving confirmation of the Plan and the transfer of property from the Debtor and its Estate to the Reorganized Debtor and securing, on and after the Effective Date, all obligations of the Reorganized Debtor to Mansa for and on account of the Mansa Claim, as Allowed, modified and treated by this Plan. Any exercise of any rights

---

[31] The Plan treats Mansa's claim as fully secured. Because Mansa made the Election under 11 U.S.C. § 1111(b), discussed below, the proposed treatment does not run afoul of 11 U.S.C. § 506(a).

**MEMORANDUM OPINION AND ORDER**                                    41

of foreclosure by Mansa of any such liens, security interests, other interests, and rights, shall be in compliance with the terms of this Plan, including the modification and treatment of the Mansa Claim, and shall be compliance with all applicable law.

5.9.3 Additional Liens and Collateral. In addition to the Liens preserved pursuant to paragraph 5.9.2, Mansa shall receive as additional collateral for the Mansa Claim, a lien, junior in priority to any existing liens, on the Guarantor Joint Proponent Property. Consistent with paragraph 5.9.2, any exercise of any rights or foreclosure by Mansa of any such liens, security interests, other interests, and rights, shall be in compliance with the terms of this Plan, including the modification and treatment of the Mansa Claim, and shall be compliance with applicable law.

5.9.4 Prepayment. Notwithstanding anything contained to the contrary in any of Mansa's loan documents, the Reorganized Debtor may prepay the Mansa Claim in full, with all then accrued interest, at any time without any prepayment or other penalty. Any prepayment by the Reorganized Debtor that is less than the full amount of the Mansa Claim shall be applied by and credited against the then-outstanding principal balance owed on the Mansa Claim as otherwise provided for in this section, and any future interest on the Mansa Claim shall be calculated based on the reduced principal of the Mansa Claim remaining after application of the prepayment.

5.9.5 Rights Against Guarantors. For the avoidance of doubt, nothing in this Plan discharges any claim that Mansa may have against any person other than the Debtor and Reorganized Debtor for or on account of any claim by Mansa against the Debtor, including, without limitation, for the Mansa Claim. Notwithstanding the foregoing, Mansa's rights under any guaranties against the Guarantors, including John Blomfield and Shelby Weaver, are expressly subject to the injunctive relief described and specified in Section 12.9 of the Plan.

Whether this proposed treatment complies with the requirements of § 1129(b)(2)(A) requires analysis of Mansa's different types of collateral – its interests in real and personal property and its interests in the cash held in the Debtor's operating accounts[32] as of the Effective Date, each of which will be addressed below.

Before beginning that analysis, however, the Court notes that Mansa elected to have its claim treated as fully secured under 11 U.S.C. § 1111(b). *See* Secured Creditor's Election

---

[32] As discussed in § III.D, *supra*, the Final Cash Collateral Order granted Mansa a lien on the Debtor's operating accounts.

Pursuant to Section 1111(b) of the Bankruptcy Code and Bankruptcy Rule 3014 [ECF No. 306] (the "**Election**"). In the Election, it appears that Mansa is attempting to bifurcate its claim into secured and unsecured portions, stating that "Mansa's 1111(b) election does not extend to Mansa's unsecured claim for breach of contract damages arising out of that certain Non-Competition Agreement, dated as of July 5, 2013, between the Debtor and Mansa, which claim as of the Petition Date totaled approximately $600,000." *Id.* at 1-2. Notably, Mansa filed a single, secured Proof of Claim in the amount of "Not Less Than $9,318,664," which amount specifically included the $600,000 that Mansa now wants to except from the Election. *See* Proof of Claim No. 31-1, Part 2 ¶¶ 5, 9 (Mansa's claim is "not less than $9,318,664, consisting of: … (c) $298,890 in accrued and unpaid payments due under a noncompete agreement executed in connection with the Loan Documents; (d) $298,850 in future non-compete payments…. [T]he claims set forth in this Proof of Claim are filed as secured claims…."). Mansa has not cited to, nor could the Court find, any precedent that would permit a secured creditor to except out portions of its secured claim from a § 1111(b) election. In fact, § 1111(b)(2) specifically states that "[i]f such election is made, then notwithstanding section 506(a) of this title, such claim is a secured claim to the extent that such claim is allowed." Thus, the Election will apply to Mansa's entire claim.

### a) The Real and Personal Property

In light of the Election, to be confirmable, the Plan must provide that Mansa has a continuing lien against its collateral to secure the outstanding balance of its allowed claim (assumed to be $9,318,644) and have the right to receive, over time, cash payments equal to the allowed amount of its claim. The cash payments, however, need only have a present value equal to the value of the Debtor's interest in the collateral less the amount of senior claims against the

same collateral, or approximately $8,948,307.12.[33]  *See First Fed. Bank of California v. Weinstein*, 227 B.R. 284, 294 (9th Cir. BAP 1998); 7 Collier On Bankruptcy, ¶ 1111.03[c][4] (Alan N. Resnick & Henry J. Summer, eds. 16th ed.).

So, the question becomes what interest rate must the Plan provide to Mansa to ensure that the Plan satisfies § 1129(b)?  Both parties agree that a formula-based approach is the proper method to determine the appropriate Cramdown Interest Rate.  Here, each party's expert started his analysis with a base rate, the Debtor starting at a market-based rate of interest and Mansa at the prime rate, and then adjusted the rate to reflect the "risk adjustment" factors discussed in *Till* and/or *Texas Grand Prairie*.[34]  Using this approach, the Debtor proposes a Cramdown Interest Rate of 4.25%, while Mansa proposes 10.38%.  The Court will address these rates in turn.

The Debtor's expert began his analysis based upon a range of interest rates that he felt accounted for the industry risk associated with hotel-based lending.  To determine these base rates, Lucas visited the websites for Commercial Loans Direct and United Financial Group to view the currently-offered rates on hotel loans with loan-to-value ratios similar to the proposed Mansa restructuring.  Hr'g Tr. 7/29/15 at 190:22-191:10.  Thus, as opposed to beginning with the prime rate of 3.25% and making adjustments based upon the *Texas Grand Prairie* factors, Lucas began with the following base rates: 4.19% (based upon information from Commercial Loans

---

[33] The parties stipulated that the value of the Dallas Hotel as of July 1, 2015 was $8.6 million.  Further, per the Projections, it is anticipated that the Debtor will have approximately $700,000 in its operating accounts as of the Effective Date.  Although Mansa also has a lien on the personal property at the Corpus Hotel, it is a second lien and the value of the property is relatively de minimis (estimated at between $35,000 to $70,000).  Hr'g Tr. 7/31/15 at 45:16-19.  Thus, the overall value of Mansa's collateral, as of the Effective Date, is approximately $9,300,000 ($8.6 related to the Dallas Hotel plus $700,000 in cash).  However, Propel holds senior liens on the Dallas Hotel of $351,692.88 (calculated as the Class 2.2 Claim of $179,432.72 plus the Class 2.4 Claim of $172,260.16), resulting in the $8,948,307.12 figure used in this Memorandum Opinion and Order.

[34] The Debtor argues that, in *Texas Grand Prairie*, 710 F.3d at 332, the Fifth Circuit noted that the ultimate risk adjustment is typically between 1% to 3%, and that this Court should consider those percentages an upward cap.  The Court disagrees.  First, there is nothing in *Texas Grand Prairie* indicating that the Fifth Circuit would not approve of a risk adjustment over 3%.  Second, as noted in § II.A, *supra*, the Fifth Circuit has mandated a flexible approach to determine cramdown rates of interest, which is contrary to imposing an arbitrary 3% cap.

**MEMORANDUM OPINION AND ORDER**                                                                44

Direct) and 4.3%, (based upon information from United Financial Group). With those rates in hand, Lucas made the following "risk adjustments" under *Texas Grand Prairie*,[35] giving both a low and a high range adjustment for each factor. Lucas then settled on a mid-range of 4.25% (or prime plus 1%), as follows:

| Factor | Debtor's Risk Adjustment Range | |
|---|---|---|
| | Low | High |
| Quality of the Debtor's Management | -0.25% | 0.00% |
| Commitment of the Debtor's Owners | -0.10% | 0.00% |
| Health and Future Prospects of the Debtor's Business | 0.00% | 0.50% |
| Quality of the Collateral | -0.10% | 0.00% |
| Feasibility and Duration of the Plan | 0.00% | 0.00% |
| Adjusted Rate Mid-Point (Commercial Loans Direct) | 4.21% | |
| Adjusted Rate Mid-Point (United Financial Group) | 4.33% | |
| Proposed Cramdown Rate of Interest | 4.25% | |

Conly served as Mansa's testifying expert on the appropriate Cramdown Rate of Interest for the Plan. Conly followed a strict *Till* analysis, beginning with the prime rate of 3.25%. He then adjusted the prime rate for each of the factors discussed in *Till*, giving both a low and high range adjustment for each factor. Conly then settled on a mid-range of 10.38%, as follows:

| Factor | Mansa's Risk Adjustment Range | |
|---|---|---|
| | Low | High |
| Circumstances of the Estate | 1.00% | 2.00% |
| Nature of the Security | 1.50% | 2.00% |
| Plan Feasibility | 1.50% | 2.50% |
| Plan Duration | 1.75% | 2.00% |
| Range | 9.00% | 11.75% |

---

[35] The Plan, as initially submitted, proposed to repay Mansa with 79 monthly payments, culminating in a balloon payment at month 80 based upon a 30-year amortization period and a 4.25% cramdown interest rate. The Debtor's First Plan Modification reduced the repayment period from 80 months to 60 months, while the interest rate remained at 4.25%.

| Factor | Mansa's Risk Adjustment Range |
|---|---|
| Proposed Cramdown Rate of Interest | 10.38% |

The Court disagrees with each expert's allocation of risk, finding Lucas's analysis too lenient and Conly's too harsh. For example, the only upward risk adjustment given by Lucas is .5% related to the "health and future prospects of the Debtor's business." *See* Interest Rate Analysis – Hotel Loan Restructuring [Ex. D-26] (the "**Lucas Report**") at 21.[36] Notably, Lucas gives a downward to neutral adjustment based on the quality of the Debtor's management. Although the Court appreciates Blomfield's dedication and efforts throughout this case, a significant reason for the Debtor's financial difficulties prepetition was that Blomfield permitted multiple personal tragedies to interfere with his management of the Debtor's business operations. Although Lucas discusses Blomfield's management failure in his report, he then dismisses the risk:

> The confluence of the Night/Wyndham hotel franchise issue and the tragic events in Mr. Blomfield's life which occurred in 2013 and 2014 played a significant role in the Dallas hotel's underperformance during that period. While the Dallas hotel's performance during this period cannot be disregarded, the underperformance in 2013 and 2014 does not reflect management's current ability to run the Debtor's hotel operation.

Lucas Report [Ex. D-26] at 9. The Court is not persuaded by Lucas's dismissal of Blomfield's shortcomings on this point, and finds that a risk adjustment of 1.0% appropriate.

The Court also found Lucas's failure to allocate any risk adjustment to the quality of Mansa's collateral troubling. In fact, the Lucas Report overstates Mansa's collateral package by valuing the Dallas Hotel at $9.3 million (versus the agreed $8.6 million) and failing to account for Propel's liens against the Dallas Hotel of approximately $351,692.88. The Lucas Report also

---

[36] The Lucas Report was admitted into evidence for demonstrative purposes by agreement of the parties. Hr'g Tr. 7/29/15 at 166:4-7.

states that Blomfield's net equity in Guarantor Joint Proponent Property is $2.92 million; however, it gives no consideration to the fact that the property is located in a foreign jurisdiction and the potential impediments to foreclosing on that collateral. Based upon the record before it, the Court finds that a risk adjustment of 1.75% would adequately account for any risk placed upon Mansa due to the quality of its collateral.

Finally, although the Court has found that the Projections are reasonable, it does recognize that there is a risk that the Debtor could be unable to fund Mansa's balloon payment at the end of five years. To account for this risk, the Court finds it would be appropriate to assign an upward risk adjustment of .75% related to the feasibility and duration of the Plan.

On the other end of the spectrum, the Court finds that Conly's testimony was overly critical. One of Conly's adjustments, 1.0% – 2.0% for "circumstances of the estate," is based primarily on the Receiver's Report, discussed in § III.A, *supra*. Conly testified that he reviewed the Receiver's Report, Hr' Tr. 7/29/15 at 163:18-164:5, and its finding are clearly relied upon in the Conly Report, Conly Report [Ex. M-27] at 9-10. Conly, however, did not visit the Las Vegas Hotels nor did he speak with the Receiver or Blomfield regarding the findings in the Receiver's Report. Hr'g Tr. 7/29/15 at 199:24-2001:14. The Court appreciates that the Receiver's Report was prepared by a court-appointed professional; however, it is troubled by Conly's blind reliance on the report without any independent investigation. Indeed, while on the stand, Blomfield was able to clarify many of the findings set forth in the Receiver's Report. For example, Conly cites to the Receiver's finding that approximately 12 rooms in the Las Vegas Hotels were out of service because of bed bugs, failed health inspections, and other failure to repair damage. Blomfield, however, clarified that although 12 rooms were out of service, bed bugs were found in only two rooms. According to Blomfield's uncontroverted testimony, health regulations

require that, when bed bugs are discovered, the hotel close the rooms above, below, and across from the room at issue, resulting in 12 rooms being out of service. Hr'g Tr. 7/28/15 at 63:6-21. Further, Blomfield testified that he is not aware of the Las Vegas Hotels having failed any health inspections. *Id.* at 63:24-64:2. Blomfield went on to persuasively explain away many other findings from the Receiver Report that Conly relied upon. *Id.* 64:4-69:23.

Moreover, Conly's upward adjustment of between 1.5% to 2.5% based on Plan feasibility is overstated. As discussed in § IV.B.5, *supra*, the Court specifically finds that the Plan is feasible. Moreover, Conly's substantial risk adjustment for Plan feasibility is not credible in light of the Conly's Report's specific finding that the "financial projections contained in the disclosure statement filed in connection with the [Debtor's] Plan, including the underlying assumptions and computations, are reasonable and supportable." Conly Report [Ex. M-27] at 5.

Finally, the Court finds an upward adjustment of between 1.75% - 2.0% for the duration of the Plan unreasonably high. Notably, the Conly Report assumes a balloon payment to Mansa at the end of seven years. The Plan, however, was subsequently modified so that Mansa will be paid in full at the end of five years, substantially reducing the risk associated with the duration of the Plan.

Although Mansa's proposed Cramdown Interest Rate is too high, based upon the record before it, the Court finds and concludes that the Cramdown Interest Rate proposed by the Debtor (4.25%) is insufficient to provide Mansa with the deferred cash payments it is entitled to receive under 11 U.S.C. § 1129(b)(2)(A)(II) in light of its election under § 1111(b).[37] Thus, the Plan may not be confirmed. Mansa's objection is sustained as set forth herein.

---

[37] Although the Plan does not state that the Cramdown Interest Rate may be determined by the Court, the Court would confirm a plan with the same repayment terms to Mansa and other creditors (assuming the same or better Projections) if the Cramdown Interest Rate was at least 6.75%.

**MEMORANDUM OPINION AND ORDER** 48

### b) The Pre-Confirmation Cash Collateral

Mansa's interest in cash collateral as of the Effective Date requires a separate analysis because, unlike the hard collateral that will remain place, Mansa's pre-confirmation cash collateral will dissipate over the life of the Plan. Indeed, Mansa argues that the Plan's proposed use of its pre-confirmation cash collateral to fund payments to lower priority creditors on the Effective Date prevents the Plan from being fair and equitable. *See e.g., In re Geijsel*, 480 B.R. 238 (Bankr. N.D. Tex. 2012) ("Here, however, there is no equity and the Debtors propose to use cash generated during the case to pay-off junior, unsecured, and administrative claims, either on the effective date or shortly after, without providing additional security to Lone Star. … The Debtors have proposed no means of compensating Lone Star for Lone Star's potential loss of collateral (the cash) except for the prospect that the Plan will work-out in the end. A court cannot so ignore the rights of a secured creditor."); *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 479–80 (Bankr. S.D. Ohio 2011) (discussing the debtor's use of pre-confirmation cash collateral in the context of plan feasibility, finding that sufficient cash could be generated between confirmation and the effective date to fund effective date obligations without using the lender's cash collateral); *In re Smithville Crossing, LLC*, No. 11–02573–8, 2011 WL 5909527, at *10, 2011 Bankr. LEXIS 4605, at *30–31 (Bankr. E.D.N.C. Sept. 28, 2011) ("If the debtor seeks to use the secured party's collateral post-confirmation to fund its plan then the debtor must provide the secured party with the collateral's 'indubitable equivalent.'"); *In re Mayslake Village–Plainfield Campus, Inc.*, 441 B.R. 309, 322 (Bankr. N.D. Ill. 2010) ("The net rents being used to pay the Class 7 claim are presently part of the Lender's cash collateral. The effect of paying the Class 7 claim before the Lender's Class 2 and Class 3 claims is to subordinate the Lender's claims" and finding that "the Plan's treatment of the Lender's claims violates the 'fair and equitable' requirement."); *In re Griswold Bldg., LLC*, 420 B.R. 666, 706 (Bankr. E.D. Mich.

2009) (noting that "the Debtors propose to use the Lender's cash collateral to pay claims that have a lower priority under the Bankruptcy Code than the claims of the Lender, without providing any replacement collateral for the Lender" and stating that "[i]t is hard to see how that is fair and equitable"); *In re Gramercy Twins Assocs.*, 187 B.R. 112, 126 (Bankr. S.D.N.Y. 1995) (finding the debtor's plan not feasible on alternate grounds, including that it did not provide for repayment of cash collateral used to pay administrative fees over the objection of the secured creditor).

Here, the Court finds that the Plan adequately protects Mansa's interest in, and gives it the indubitable equivalent of, its pre-confirmation cash collateral. First, it is undisputed that the Corpus Hotel is stable, its revenues are increasing by 5% each year, and it generates significant excess cash flow. And, although Mansa's loan is secured mainly by the Dallas Hotel, the Plan payments are an obligation of the Debtor. As such, Mansa benefits not only from the cash flow generated by the Dallas Hotel but from the net cash flow generated by the Corpus Hotel. These funds, along with those generated by the Dallas Hotel, will be used to fund the Plan, purchase insurance, pay liens against the Dallas Hotel senior to Mansa, pay fees due under the Wyndham franchise agreement, and pay for the upkeep and maintenance of the Dallas Hotel. Second, the Debtor has a substantial equity cushion in the Corpus Hotel, and will have between $2.5 and $4.5 million in cash at the end of the Plan (depending on the Cramdown Interest Rate utilized). These additional assets adequately protect Mansa's interests under the Plan as they may be used to either fund the balloon payment due to Mansa or as a credit enhancement to help refinance the Dallas Hotel.

Thus, the Court finds and concludes that the Plan gives Mansa the indubitable equivalent of its lien on the pre-confirmation cash collateral and meets the requirements of 11 U.S.C. § 1129(b)(2)(A)(iii).

### 7. The Plan Fails to Meet the Requirements of 11 U.S.C. § 1123(a)(6) and § 1129(a)(12).

While not raised by Mansa, the Court notes two additional problems with the Plan that prevent its confirmation. First, § 1126(a)(6) of the Bankruptcy Code requires, among other things, that the Plan provide for the inclusion in the Debtor's charter of a provision prohibiting the issuance of nonvoting equity securities. Based upon its review of the Plan, the Court finds that the Debtor has failed to comply with § 1126(a)(6). Second, the Plan does not require that all fees due under 28 U.S.C. § 1930 be paid on or before the Effective Date, as required by § 1129(a)(12).

## V. THE PROPOSED THIRD-PARTY TEMPORARY INJUNCTION IS IMPROPER AND CANNOT BE GRANTED.

Section 12.9 of the Plan seeks to impose a temporary injunction prohibiting creditor collection efforts against third parties while the Debtor is performing under the Plan. More specifically, the relevant portions of Section 12.9 state:

> NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, NEITHER THE GUARANTORS, INSIDERS, OFFICERS, DIRECTORS, EMPLOYEES, OTHER RESPONSIBLE PARTY OR PERSON OF THE DEBTOR, INCLUDING BUT NOT LIMITED TO JOHN BLOMFIELD AND SHELBY WEAVER, NOR THE INTEREST HOLDERS OF THE DEBTOR (THE "INJUNCTIVE RELIEF PARTIES") SHALL BE DISCHARGED AND RELEASED FROM LIABILITY, IF ANY, FOR CLAIMS AND DEBTS UNDER THIS PLAN. HOWEVER, ABSENT FURTHER COURT ORDER UPON NOTICE AND HEARING, THE EXCLUSIVE REMEDY FOR PAYMENT OF ANY CLAIM OR DEBT ADDRESSED IN THE PLAN, SO LONG AS THE PLAN IS NOT IN UNCURED DEFAULT, SHALL BE THE PLAN. CONSEQUENTLY, UPON CONFIRMATION OF THE PLAN, ALL CREDITORS OF THE DEBTOR HAVING A CLAIM HEREIN SHALL BE TEMPORARILY ENJOINED FROM TAKING ANY ACTION TO PROSECUTE OR COLLECT ALL OR ANY PORTION OF

THEIR CLAIM AGAINST ANY OF THE INJUNCTIVE RELIEF PARTIES, SO LONG AS THE PLAN IS NOT IN UNCURED DEFAULT. UNLESS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, AN UNCURED DEFAULT SHALL MEAN A DEFAULT THAT REMAINS UNCURED FOR THIRTY (30) DAYS AFTER RECEIPT BY THE REORGANIZED DEBTOR OF WRITTEN NOTICE FROM ANY CREDITOR AFFECTED BY SUCH DEFAULT. … TO THE EXTENT NECESSARY, ANY APPLICABLE STATUTE OF LIMITATIONS AGAINST COLLECTION FROM ANY OF THE INJUNCTIVE RELIEF PARTIES IS SPECIFICALLY TOLLED FROM THE PERIOD OF TIME FROM THE PETITION DATE UNTIL THE DATE UPON WHICH THE DEBTOR FAILS TO TIMELY CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN. FAILURE BY THE DEBTOR TO CURE ANY WRITTEN NOTICE OF DEFAULT AS SET FORTH IN THE PLAN SHALL RESULT IN THE DISSOLUTION OF THE INJUNCTION GRANTED HEREUNDER AS TO THE AFFECTED CREDITOR WITHOUT FURTHER ORDER OF COURT.

Plan [Ex. D-1] § 12.9 (emphasis added). The proposed temporary injunction was orally modified at the Confirmation Hearing when Debtor's counsel stated, on the record, that Blomfield and Weaver had each agreed to not transfer their personal assets outside the ordinary course of business while the temporary injunction was in place.

Mansa objects to § 12.9 on the grounds that plans generally cannot enjoin creditors from pursuing remedies against non-debtors. *See* Objection [ECF No. 305] ¶ 26 (citing *In re Prussia Assoc.*, 322 B.R. 572, 603 (Bankr. E.D. Pa. 2005) (denying confirmation of the plan where the inclusion of injunctive provisions to last for seven years was "clearly invalid under any standard"); *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 781 (Bankr. N.D. Tex. 2007) (rejecting a proposed plan because it included a nonconsensual third party release and the court could find no authority in the Code or case law that would allow for that provision)). Mansa further argues that, although third party injunctions may be entered in "unusual circumstances," they are issued very sparingly and not under the facts of this case. *Id.* ¶ 27 (citing *In re Bernhard Steiner Pianos, USA, Inc.*, 292 B.R. 109, 116 (Bankr. N.D. Tex. 2002); *In re Seatco, Inc.*, 257 B.R. 469, 477 (Bankr. N.D. Tex. 2001)). According to Mansa, such unusual circumstances exist

when the debtor and non-debtor parties enjoy "such an identity of interest that the suit against the non-debtor is essentially a suit against the debtor and when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization." *Id.* Although not raised in the Objection, at the Confirmation Hearing, Mansa also questioned the Court's authority to enter the third-party injunction, citing to *Stern v. Marshall*, ––– U.S. ––––, 131 S. Ct. 2594, (2011).[38]

The Debtor argues that the proposed temporary injunction is both appropriate and necessary to ensure the orderly administration of the Debtor's estate and to prevent disruption to the Debtor's reorganization efforts. Debtor's Brief ¶ 64 (citing to *In re Zale Corp.*, 62 F.3d 746, 761 (5th Cir. 1995); *Bernhard Steiner*, 292 B.R. at 116; *Seatco*, 257 B.R. 469 (Bankr. N.D. Tex. 2001)). As conceded by the parties, the propriety of the proposed temporary injunction is governed by the standards set forth in *Seatco* and *Bernard Steiner*,[39] to which this Court will now turn.

Both *Seatco* and *Bernhard Steiner* involved 100% plans under which collection actions against third parties were temporarily enjoined. *Seatco*, the earlier-decided opinion, established the standard under which plan-related third party injunctions are considered. The *Seatco* court first examined the guidance set forth in *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995). In *Zale*, the Fifth Circuit noted that:

> While a temporary stay prohibiting a creditor's suit against a nondebtor ... during the bankruptcy case may be permissible to facilitate the reorganization process in accord with the broad approach to nondebtor stays under section 105(a) ..., the stay may not be extended post-confirmation in the form of a permanent injunction that effectively relieves the nondebtor from its own liability to the creditor. Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor

---

[38] As discussed below, the Court finds that the Debtor has not satisfied its burden of proof to be entitled to receive a third-party temporary plan injunction. As such, the Court will not analyze Mansa's objection that this Court lacks constitutional authority to enter such an injunction.

[39] The court in *Bernhard Steiner* applied the standard established by the *Seatco* court; thus, the *Bernard Steiner* holding will not be analyzed in detail in this Memorandum Opinion and Order.

**MEMORANDUM OPINION AND ORDER**                                                     53

> protection.... The impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions. Such an injunction may be proper under unusual circumstances. These circumstances include (1) when the non-debtor and the debtor enjoy such an identity of interest that the suit against the non-debtor is essentially a suit against the debtor, and (2) when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization. When either of these circumstances occur, an injunction may be warranted.

*Zale*, 62 F.3d at 761. Although dicta, the *Zale* court clearly recognized that circumstances may arise in a bankruptcy case warranting the issuance of a temporary injunction of third party actions as a part of confirmation. If the *Zale* factors are met, the Court must also consider the traditional factors governing the issuance of temporary injunctions. *Seatco*, 257 B.R. at 477 (listing the factors as (1) a substantial likelihood that the movant will prevail on the merits, (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction, and (4) that the granting of the injunction will not disserve the public interest).

Based upon the record before it, the Court finds that the Debtor has not met the two-factor test of *Zale.* First, the Debtor has not shown that it, on the one hand, and Blomfield and Weaver,[40] on the other, enjoy such an identity of interest that a suit against the non-debtors is essentially a suit against the Debtor. Additional background regarding *Seatco* and *Bernhard Steiner* will help put this finding into context. In *Seatco*, the Court found:

> Kester is the Debtor's founder, President, and sole shareholder. Kester guaranteed payment of the Debtor's obligations to CIT pursuant to the Guaranty. The evidence is undisputed that if CIT successfully pursued Kester on the Guaranty, Kester would not be able to satisfy CIT's claims and CIT would be entitled to

---

[40] The proposed third-party temporary injunction covers more individuals than Weaver and Blomfield. *See* Plan § 12.9. The Confirmation Hearing record, however, reflects that Mansa only holds potential claims against Weaver and Blomfield. Thus, any proposed temporary injunction in favor of other third parties appears irrelevant, and will not be addressed in this Memorandum Opinion and Order other than to find that the Debtor failed in its proof with respect to them as well.

**MEMORANDUM OPINION AND ORDER** 54

> execute against Kester's stock ownership in the Debtor, prompting Kester's resignation as President and the cessation of his involvement in the business. The evidence is also undisputed that if Kester was no longer affiliated with the Debtor, other key managers would leave, as would key customers. The record is clear— Kester's continued participation and involvement is essential to the Debtor's business operations and will be essential to the Debtor's successful reorganization under the Plan

*Seatco*, 257 B.R. at 276.  Similarly, the *Bernhard Steiner* court found:

> The success or failure of the Debtor lies mainly, if not exclusively, with the efforts, reputation, and dedication of Mr. Kahn. For all practical purposes, at this time, he is the Debtor. This Debtor will survive and creditors will be paid under the plan only if Mr. Kahn is allowed to conduct the business of the Debtor without distraction. Debtor and Kahn enjoy such an identity of interest that the prosecution of the claims, or attempted collection of any judgments against Kahn would be tantamount to prosecuting and/or seeking collection from the Debtor.

*Bernhard Steiner*, 292 B.R. at 117.  Each of these cases indisputably involved individuals who, for all intents and purposes, were the debtor, and where the debtor's reorganization would rise or fall with that individual.  The record established at the Confirmation Hearing does not support such a finding in this case.

In support of the identify-of-interests factor, the Debtor argues that: (1) Blomfield and Weaver hold and control 100% of the Debtor's stock and the basis of any enjoined suit would be specifically addressed under the plan; "[c]onsequently, any lawsuit against the Guarantors is practically a suit against the Debtor,"[41] (2) the terms of the Corpus Franchise Agreement and the Dallas Franchise Agreement each allow the franchisor to terminate its franchise agreement upon any transfer of the Debtor's equity, including execution of any Guaranty-related judgment, which would significantly affect the Debtor's ability to reorganize, and (3) any change of ownership, such as through execution of a judgment, would result in a dramatic reduction and/or restriction of the Debtor's ability to use its valuable Net Operating Losses ("**NOLs**").  The Court will address each of these arguments in turn.

---

[41] Debtor's Brief [ECF No. 309] ¶ 66.

First, the Court disagrees that ownership coupled with a guaranty is sufficient to satisfy the identity of interest discussed in *Zale*. *See Zale*, 62 F.3d at 761. Indeed, this type of overlap between shareholders and guarantors exists in a significant number of bankruptcy cases involving closely-held corporations. Granting an injunction on those grounds would make third party plan injunctions commonplace, which is clearly the incorrect outcome under Fifth Circuit precedent.

Second, although cancellation of either franchise agreement would likely have an adverse effect on the Debtor's ability to reorganize, this scenario is simply too attenuated to be grounds to grant the third-party Plan injunction. Not only would Mansa have to be successful on its suit under the Blomfield and Weaver guarantees, it would then have to execute on the Debtor's stock held by Blomfield and Weaver. Further, although each franchise agreement states that the rights under the agreement are not freely transferable,[42] transferees are permitted to seek authorization to continue operating under the agreement and whether to permit the transfer is left to each franchisor's discretion. There is nothing in the Confirmation Hearing record to indicate whether the franchisors would terminate the agreements under the Debtor's hypothetical scenario or whether the franchisors would permit Mansa (or some other third party) to continue to operate under the franchise agreements.

Third, the only evidence before the Court regarding NOLs is that the Debtor has NOLs. The Confirmation Hearing record is devoid of any evidence regarding their amount or significance. Thus, the Court has no basis upon which to find that the potential loss of the NOLs would have an "adverse impact on the debtor's ability to accomplish reorganization." *See Zale*, 62 F.3d at 761.

---

[42] *See* Howard Johnson International, Inc. Franchise Agreement [Ex. D-43] ¶¶ 9.1, 9.3; Wyndham Hotel Franchise Agreement [Ex. D-44] ¶¶ 15(B), 17(A)(6).

Simply put, there is nothing in the record indicating that the Debtor, on the one hand, and Blomfield and Weaver, on the other, share the type of identity of interest that existed in *Seatco* and *Bernhard Steiner*. With regard to Blomfield, the record reflects that he lives and works on-premises at the Dallas Hotel. Warren, the General Manager of the Dallas Hotel, testified that having Blomfield in such close proximity made it easier to communicate, obtain approvals, and discuss operations than it would be if management were located off-premises. Warren also testified that Blomfield is a highly motivated individual who motivates those around him. There is nothing in the record, however, showing that: (1) Blomfield would no longer work with the Debtor if Mansa executed on his stock interests in the Debtor, and (2) if Blomfield did leave, his services could not be adequately performed by a newly-appointed Secretary and Treasurer and/or property manager. Overall, the record shows that Blomfield is a highly motivated, involved, and intelligent man who works well with and is respected by those around him; however, the record does not support a finding that Blomfield is irreplaceable and that his resignation as the Debtor's Secretary and Treasurer or property manager would be a death knell, as was the case in both *Seatco* and *Bernhard Steiner*.

The identity of interest is even more lacking with Weaver, who is not involved in the day-to-day management of business operations. Instead, Weaver handles the accounting and bookkeeping functions for the Debtor, primarily from Anchorage, Alaska. Weaver's actions during the case have certainly helped the Debtor's accounting functions get back on track, but there is nothing in the record indicating that the Debtor could not successfully reorganize utilizing the services of another accounting professional.

Because the Debtor has failed to satisfy the *Zale* factors, this Court need not address the additional factors considered by courts when granting a third-party plan injunction. Accordingly,

based on the record before it, the Court finds and concludes that the Debtor has failed to carry its burden of proof with respect to the proposed third party injunction, and that the Plan, as drafted, may not be confirmed.

## VI.    MANSA'S MOTION TO LIFT STAY

Mansa filed its Motion to Lift Stay on February 2, 2015, and a preliminary hearing on the motion was held March 3, 2015.  The Court denied Mansa preliminary relief, and Mansa was directed to set the Motion to Lift Stay for final hearing.  At Mansa's request, the Motion to Lift Stay was heard concurrently with the Plan at the Confirmation Hearing.

The Motion to Lift Stay requests relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (d)(2), which provide in relevant part that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> > (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> >
> > (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> >
> > > (A) the debtor does not have an equity in such property; and
> > >
> > > (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).

Mansa alleges that cause exists to lift the automatic stay under § 362(d)(1) because: (1) the Debtor is unable to pay its ad valorem taxes, which is giving rise to priming liens and further decreasing Mansa's interests, and (2) operations at the Dallas Hotel are declining and there is no evidence that operations will improve.  The Court finds each of these arguments unpersuasive.

First, the 2013 taxes were paid with a prepetition loan obtained from Propel, which also purchased the 2014 ad valorem tax claims from various taxing authorities.  And, as reflected in

the Plan, the Debtor and Propel have reached consensual repayment terms. As to future taxes, the Projections clearly show that the Debtor will have sufficient funds on hand to pay ad valorem taxes arising during the life of the plan. *See generally* Projections [Ex. D-4].

Second, nearly six months passed between the date the Motion to Lift Stay was filed and the Confirmation Hearing. The record shows that, since the motion was filed, the Debtor's operations have significantly improved, including operations at the Dallas Hotel.[43] Accordingly, the Court finds that there is no "cause" to grant Mansa relief from the automatic stay under 11 U.S.C. § 362(d)(1).

The Court, however, finds Mansa's arguments under § 362(d)(2) somewhat more persuasive. In this regard, Mansa alleges that the Debtor has no equity in the Dallas Hotel and that the Dallas Hotel is not necessary for an effective reorganization. Mansa has the burden to establish the lack of equity in the property, which it has done,[44] and the Debtor has the burden to establish that the property is necessary for an effective reorganization. *See id.* § 362(g); *Canal Place Ltd. P'ship v. Aetna Life Ins. Co., (In re Canal Place Ltd. P'ship)*, 921 F.2d 569, 576 (5th Cir. 1991). As explained by the Fifth Circuit in *Canal Place*, "[t]he reference to an 'effective' reorganization should require relief from the automatic stay if there is no reasonable likelihood of reorganization due to creditor dissent or feasibility considerations." *Canal Place*, 921 F.2d at 576. Further, the Debtor must show that it has a "reasonable prospect for a successful reorganization within a reasonable time," and the Debtor must do more than "manifest unsubstantiated hopes for a successful reorganization." *See id.* (quotations and internal citations

---

[43] Since the Motion to Lift Stay was filed in early February 2015, it cites to the Debtor's failure to meet its 2014 cash collateral budgets as cause. As discussed in § IV.B.5, *supra*, Warren has corrected the issue that caused the Debtor to miss its November and December 2014 budgets, and the Debtor has performed to its 2015 budgets.

[44] The parties have stipulated that, as of July 1, 2015, the Dallas Hotel has a value of $8.6 million. Also, for purposes of the Confirmation Hearing only, Mansa proved up its filed claim in the amount of $9,318,664.

**MEMORANDUM OPINION AND ORDER** 59

omitted). Mansa argues that this precedent requires that the Court grant it relief from the automatic stay.

The Court disagrees. As explained herein, the Plan, as drafted, may not be confirmed. But, with a few modifications, the Debtor could file a new plan that would address this Court's concerns (an "**Amended Plan**"), and the current Plan's projections clearly show that the Dallas Hotel would be necessary for an effective reorganization. An Amended Plan, however, must be submitted relatively soon in order to protect Mansa's rights; otherwise, the Debtor will have failed to carry its burden to show that an effective reorganization may be accomplished in a reasonable period of time. *See id.* Specifically, the Debtor filed its Voluntary Petition on October 7, 2014, less than one year ago. If the Debtor files an Amended Plan and any other required documents within 20 days of the entry of this Memorandum Opinion and Order on the Court's docket, confirmation of an Amended Plan will likely be considered by this Court within 14 months of the Petition Date, which is not an unusually long period of time considering the contentious nature of the Debtor's Chapter 11 case. However, in the event that the Debtor fails to file an Amended Plan and any other required documents within 20 days after the entry of this Memorandum Opinion and Order on the Court's docket, the Motion to Lift Stay shall be granted.

## VII. CONCLUSION

For the reasons set forth above, the Court finds and concludes that the Plan, as drafted, may not be confirmed. The Plan's infirmities, however, may be corrected and it may be possible to consider confirmation of an Amended Plan within a reasonable timeframe. Specifically, an Amended Plan must:

- not include an improper third-party temporary injunction, as is currently found in Plan § 12.9;

- propose a Cramdown Interest Rate with respect to Mansa's claim sufficient to satisfy the requirements of 11 U.S.C. § 1129(b)(2)(A);

- provide for revisions to the Debtor's charter sufficient to comply with 11 U.S.C. § 1123(a)(6); and

- state that all fees payable under § 1930 of title 28, as determined by the Court, have been paid or provide for the payment of such fees or on before the Effective Date.

The Debtor shall have 20 days from the entry of this Memorandum Opinion and Order on the Court's docket to file an Amended Plan and any other required documents. If the Debtor timely files an Amended Plan and any other required documents, the automatic stay imposed by 11 U.S.C. § 362(a) shall remain in effect until such time as the Court considers confirmation of an Amended Plan. The Debtor shall seek prompt settings from the Court's Courtroom Deputy. Alternatively, if an Amended Plan and any other required documents are not filed within 20 days of the entry of this Memorandum Opinion and Order on the Court's docket, the Motion to Lift Stay shall be granted.

Accordingly, it is hereby:

ORDERED that confirmation of the Plan is denied. It is further

ORDERED that any objection to confirmation not expressly addressed in this Memorandum Opinion and Order is overruled. It is further

ORDERED that the Debtor shall have 20 days following the entry of this Memorandum Opinion and Order on the Court's docket to file an Amended Plan and any other required documents. It is further

ORDERED that if an Amended Plan and any other required documents are timely filed, the automatic stay imposed by 11 U.S.C. § 362(a) shall remain in effect until such time as the Court considers confirmation of an Amended Plan. It is further

**MEMORANDUM OPINION AND ORDER**                                        **61**

ORDERED that if an Amended Plan and any other required documents are not timely filed, Mansa shall file a Certification of Counsel stating that the deadline has passed without such documents being filed and upload a proposed form of order lifting the automatic stay.

### # # # END OF MEMORANDUM OPINION AND ORDER # # #