

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 28, 2016**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO.  14-34874 |
| | § | (Chapter 11) |
| COUTURE HOTEL CORPORATION, | § | |
| | § | |
| DEBTOR. | § | |
| | § | Related to ECF No. 457 |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is "Debtor's Objection to Claim 45 Filed by Primary Freight Services, Inc." [ECF No. 457] (the "**Claim Objection**") filed by Couture Hotel Corporation a/k/a Hugh Black-St Mary Enterprises, Inc. (the "**Debtor**" or "**Couture**").  The Claim Objection objects to claim number 45-1 (the "**Original Proof of Claim**") filed by Primary Freight Services, Inc. ("**Primary Freight**"), which Original Proof of Claim states that its basis is "contract/services" and attaches a series of invoices for per diem and rental charges pertaining to shipping containers and their accompanying chassis.  An evidentiary hearing on the Claim Objection was commenced on

**MEMORANDUM OPINION AND ORDER** **Page 1**

May 17, 2016, and then continued on July 6, 2016.[1]  The evidentiary record was closed on July 6,

2016, and closing arguments were held on July 12, 2016.  The Claim Objection is now ripe for

ruling.[2]

After carefully considering the arguments of the parties (as advanced orally and in writing),

the evidence admitted at the hearing on the Claim Objection, and its own research of the legal

issues raised, this Memorandum Opinion and Order contains the Court's findings of fact and

conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[3]

## I.    JURISDICTION, AUTHORITY, AND VENUE

The district court of the Northern District of Texas has subject matter jurisdiction over the

Debtor's bankruptcy case pursuant to 28 U.S.C. § 1334.  This Court has the authority to determine

the allowance or disallowance of the Original Proof of Claim pursuant to 28 U.S.C. § 157(a),

(b)(1), (b)(2)(B) and the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc

adopted in the Northern District of Texas on August 3, 1984.  Venue is proper in this district

pursuant to 28 U.S.C. § 1408.

---

[1] The evidentiary hearing was continued because the parties underestimated the time necessary to make their evidentiary record and, given docket constraints, the Court ran out of time to conclude the hearing.

[2] On the date of the issuance of this Memorandum Opinion and Order, a written transcript of the May 17, 2016 hearing (but not the July 6 or 12, 2016 continued hearing) was available. The Court's audio recordings of the July 6 and 12, 2016 hearings were, however, available.  Citations to the May 17, 2016 record will take the form of May 17 Hr'g Trans. page:line-page:line.  Citations to the July 6, 2016 recording will take the form of July 6 Hr'g hours:minutes:seconds-hours:minutes:seconds. Citations to the July 12, 2016 recording will take the form of July 12 Closing hours:minutes:seconds-hours:minutes:seconds.  In addition, the Court notes that, while both parties used numbers to designate their exhibits, the parties also took care to make sure that none of their exhibit numbers overlapped.  Thus, when citing to exhibits, the Court does not distinguish between exhibits offered by Primary Freight and exhibits offered by Couture, as there is no need to do so.

[3] To the extent that a finding of fact is more properly construed as a conclusion of law, or vice versa, they should be so construed.

**MEMORANDUM OPINION AND ORDER**                                    **Page 2**

## II. PROCEDURAL HISTORY

Couture filed a voluntary chapter 11 petition on October 7, 2014. Primary Freight filed the Original Proof of Claim on February 2, 2015, and the bar date for filing proofs of claim expired on February 4, 2015. On March 15, 2016, Couture filed the Claim Objection. In the Claim Objection Couture stated that "[a]ttached to Claim 45 are a number of invoices for charges for what appears to be per diem and chasis [sic] rental charges. Couture has searched its files and records and can find no contract or agreement by and between Couture and PrimaryFreight [sic] whereby it agreed to pay any of the charges or amounts described in the invoices attached to Claim 45."[4] Primary Freight filed its "Response to Debtor's Objection to Claim 45 Filed by Primary Freight Services, Inc." [ECF No. 476] (the "**Response to the Claim Objection**") on April 15, 2016.

An evidentiary hearing on the Claim Objection was commenced on May 17, 2016. As noted previously, the parties underestimated the time necessary to make their evidentiary presentations, which resulted in the hearing being continued to July 6, 2016. On June 3, 2016, however, Primary Freight filed its "First Amended Witness and Exhibit List of Creditor Primary Freight Services, Inc. for July 6, 2016 Hearing" [ECF No. 504]. On June 6, 2016, Couture filed "Couture Hotel Corporation's Emergency Motion to (i) Strike Amended Witness and Exhibit List and (ii) Exclude Evidence Related to Alternative Bases of Recovery" [ECF No. 506] (the "**Motion to Strike**"). On June 14, 2016, a hearing was held on the Motion to Strike by agreement of the parties. At that hearing the Motion to Strike was partially granted, but the Court requested

---

[4] Claim Objection ¶ 6.

**MEMORANDUM OPINION AND ORDER**                                  **Page 3**

supplemental briefing on the issue of whether the Original Proof of Claim stated a *quantum meruit* claim.

Primary Freight submitted the requested supplemental briefing on June 27, 2016 in a pleading styled "Primary Freight Services, Inc.'s Brief in Support of Response to Debtor's Objection to Claim 45 Filed by Primary Freight Services, Inc." [ECF No. 523] ("**Primary Freight's Mid-Trial Brief**"). Also on June 27, 2016, Primary Freight filed "Primary Freight Services, Inc.'s Motion for Leave to File Amended Proof of Claim, Or Alternatively, Motion for Trial Amendment" [ECF No. 524] (the "**Motion to Amend**"). The Court did not find Primary Freight's Mid-Trial Brief or the Motion to Amend persuasive and in an oral ruling issued at the commencement of the July 6, 2016 hearing denied the Motion to Amend and granted the Motion to Strike (to the extent that the Motion to Strike was not previously granted at the June 14, 2016 hearing).[5] In that oral ruling, the Court concluded that Primary Freight was precluded from raising any *quantum meruit* arguments or presenting any evidence relevant to a *quantum meruit* claim. During closing arguments on July 12, 2016, in response to the Court's questions, Primary Freight's counsel confirmed that its sole theory of liability was implied-in-fact contract given the Court's ruling on the Motion to Amend.[6]

## III. FACTUAL BACKGROUND

The dispute here arises from the fact that Couture, a company who owns and manages

---

[5] The Court read its oral ruling into the record of the July 6, 2016 hearing. *See* July 6 Hr'g 11:01:00-11:31:00 (Court).

[6] July 12 Closing 3:02:45-3:05:15 ("THE COURT: The only argument that you've got is implied-in-fact contract, listening check, and it should be implied-in-fact from emails and the Exhibit 9 arrival notices and invoices, yes? HOODENPYLE: Yes, Your Honor, and Exhibit, well, I, my position is that Exhibit 5 and Exhibit 9 kind of go hand in hand because they both gave notice….THE COURT: Ok. No other theory of liability? That's it? HOODENPYLE: We would go with *quantum meruit*, but that was… THE COURT: Correct. HOODENPYLE: That's it, Your Honor.").

**MEMORANDUM OPINION AND ORDER** **Page 4**

hotels, requested that certain furniture it purchased for one of its hotels be shipped from China to Dallas.[7] This furniture was transported in a series of large shipping containers and their accompanying chassis.[8] Primary Freight is a logistics company that was operating as a delivery agent for another company involved in the shipping of Couture's furniture, Ever-Logistics Int'l Trading Ltd. ("**Ever-Logistics**").[9] According to Primary Freight's chief financial officer Ernie Donner ("**Donner**"), as the delivery agent for Ever-Logistics, Primary Freight was "responsible for making sure that the charges get collected here in the United States, that containers get picked up, delivered to the job site, and then returned."[10] John Blomfield ("**Blomfield**"), Couture's secretary and treasurer as well as its majority stockholder,[11] testified that the company with whom he had contracted to manufacture and ship furniture from China was HF Collection (sometimes referred to as HF Collections by the parties),[12] and that he was not aware that Primary Freight was involved in the shipping process until October of 2013, which was two to three months before the events underlying the Original Proof of Claim occurred.[13]

Problems arose between Primary Freight and Couture when Primary Freight attempted to pass along what the parties and the case law alternatively refer to as demurrage charges, rental

---

[7] May 17 Hr'g Trans. 17:24-18:17, 20:16-21:15 (Blomfield) (stating that Primary Freight was one of the companies that was involved with the shipping of furniture for one of Couture's hotels from China to Dallas, Texas).

[8] *See* Exhibit 19 (an email with an attached picture of at least some of the containers in which Couture's furniture was shipped).

[9] July 6 Hr'g 11:43:00-11:47:15 (Donner).

[10] July 6 Hr'g 11:45:50-11:46:20 (Donner).

[11] May 17 Hr'g Trans. 17:16-23 (Blomfield).

[12] May 17 Hr'g Trans. 18:12-14 (Blomfield).

[13] May 17 Hr'g Trans. 45:20-46:4 (Blomfield).

**MEMORANDUM OPINION AND ORDER** **Page 5**

charges, or per diem charges for shipping containers and chassis to Couture.[14]  Apparently, there was a gap in time between when Primary Freight dropped off a number of shipping containers full of furniture (along with their chassis) at the site of Couture's Dallas hotel, and when Couture was able to empty those containers and have them returned to Primary Freight.  As a result of this delay, Primary Freight paid $54,425.00 to an unidentified steamship line, who apparently only gave Primary Freight three (3) or four (4) days to return the shipping containers before the rental charges began accruing.[15]  In turn, Primary Freight invoiced Couture for the $54,425.00 of chassis and container rental, per diem, and/or demurrage charges (the "**Rental Charges**") that Primary Freight paid to the unidentified steamship line.[16]  Couture denies that it ever agreed to pay or be responsible for the Rental Charges.

No party maintains that Couture ever signed a written contract where it agreed to pay the Rental Charges.[17]  Instead, Primary Freight argues that an implied-in-fact contract for Couture to

---

[14] Primary Freight's invoices refer to charges for the containers as "per diem" and charges for the containers' accompanying chassis as "usage" or "rental."  *See* Exhibit 7.

[15] Exhibit 7 (an invoice to Couture passing along these charges and indicating the amount of free days for each group of containers); July 6 Hr'g 3:29:30-3:31:10 (Donner) (explaining that Primary Freight paid the charges laid out in Exhibit 7—which are equal to $54,425.00—to an unidentified steamship line).

[16] See Exhibits 6-8; July 6 Hr'g 3:29:30-3:31:10 (Donner) (explaining that Primary Freight paid the $54,425.00 indicated in Exhibit 7 to an unidentified steamship line), July 6 Hr'g 3:38:00-3:39:00 (Donner) (stating that the chart starting on page 6 of Exhibit 6 was used to calculate the amounts invoiced to Couture in Exhibit 7).  For context, "demurrage," and in this context the Rental Charges, refers to an amount to be paid for delay in loading or unloading cargo. *See Norfolk Southern Ry. Co. v. Groves*, 586 F.3d 1273, 1276 (11th Cir. 2009). Typically, demurrage is charged both to compensate the person who owns the container for use of that container, and to serve as a penalty that encourages those who are loading and unloading cargo to do so in a timely manner. *See id.*, *Houston Belt & Terminal R. Co. v. Connell Rice & Sugar Co.*, 411 F.2d 1220, 1222 (5th Cir. 1969) ("Demurrage charges are in the nature of a penalty that is assessed against railroads and shippers alike in order to promote prompt loading and unloading of cars. Frequently, demurrage is assessed and liability attaches although the delay is not caused by the assessed party.").

[17] May 17 Hr'g Trans. 18:21-19:3" (Blomfield) ("Q. Well, let me start first; did you ever enter into any written contract with Primary Freight? A. No, I didn't. Q. Did you ever enter into any agreement with Primary Freight to pay the chassis rental charges – the chassis or the rental charges that are the subject of their proof of claim? A. Absolutely not."); July 6 Hr'g 3:40:30-3:41:35 (Donner) ("Q. Mr. Donner, Primary Freight never entered into an actual, written contract with Couture, isn't that correct? A. We never entered into a written contract with Couture is correct. Q. … Isn't it true that Ever-Logistics never entered into a contract with Couture either, did it? A. That's correct.").

**MEMORANDUM OPINION AND ORDER**                                    **Page 6**

pay the Rental Charges can be established based on emails between the parties and certain documentary evidence,[18] as well as standard practice in the shipping industry. For the reasons explained below, the Court finds that there is no credible evidence that Couture ever agreed—on an express or implied basis—to pay the Rental Charges and thus concludes that the Claim Objection must be sustained.

## IV. PRELIMINARY MATTERS

### A. Couture's Business Records Objections to Exhibits 1 and 2

As a preliminary matter, before discussing the merits of the Claim Objection, the Court will address certain evidentiary objections made by the parties to each other's exhibits. Specifically, Couture objected to the admission of Exhibits 1 and 2 (offered by Primary Freight) on the ground that they were hearsay and did not fall within the business records exception to the hearsay rule.[19] Exhibits 1 and 2 are two sides (Exhibit 1 is the front and Exhibit 2 is the back) of a bill of lading prepared by Ever-Logistics. Couture argued that Primary Freight's attempt to prove up Exhibits 1 and 2 as its business records through Donner's testimony must fail because Donner, who is an employee of Primary Freight not Ever-Logistics, cannot properly testify to the facts that are necessary in order to find that the business records exception of Federal Rule of Evidence 803(6) applies. Moreover, Primary Freight objected to the admission of Exhibit 20 (offered by

---

[18] July 12 Closing 3:02:45-3:05:15 ("THE COURT: The only argument that you've got is an implied-in-fact contract, listening check, and it should be implied in fact from emails and the Exhibit 9 arrival notices and invoices, yes? HOODENPYLE: Yes, Your Honor…").

[19] July 6 Hr'g 12:09:20-12:37:30 (Couture also objected that these documents were not attached to the Original Proof of Claim and that the duplicates that comprised Exhibits 1 and 2 were not admissible under Federal Rule of Evidence 1003. Couture's objections were not sustained on these additional grounds. Couture's final objection—*i.e.*, relevance, is addressed *infra* at pp. 15-16.

**MEMORANDUM OPINION AND ORDER**                                        **Page 7**

Couture)—a shipping schedule prepared by HF Collection that Couture attempted to establish as its business record through Blomfield—on the same grounds.[20]

The Court sustained the objections to all three of these exhibits, but noted that it would engage in additional research on the issues raised by the parties and allowed the parties an opportunity to make offers of proof on Exhibits 1, 2, and 20 in case the Court determined that it had sustained the objections in error. While Primary Freight chose to make offers of proof on Exhibits 1 and 2, Couture decided to withdraw Exhibit 20.[21] After engaging in additional research and as explained below, the Court concludes that it correctly sustained the hearsay objection to Exhibits 1 and 2 and that it will not alter the ruling it made during the evidentiary hearing. Although there is a line of Fifth Circuit cases that Primary Freight argues supports the admission of Exhibits 1 and 2, the facts of those cases are distinguishable from the facts here. Furthermore, a separate line of Fifth Circuit cases counsels against the admission of Exhibits 1 and 2.

Federal Rule of Evidence 802 provides that hearsay is not admissible unless a federal statute, the Federal Rules of Evidence, or other rules prescribed by the Supreme Court provide otherwise. Hearsay is defined as "a statement that…(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."[22] Federal Rule of Evidence 803(6) provides an exception to the rule against hearsay for records of a regularly conducted activity, better known as the business

---

[20] July 6 Hr'g 5:04:30-5:12:10.

[21] July 6 Hr'g 5:11:30-5:12:30. Because Exhibit 20 was withdrawn, there is no need for the Court to revisit its initial ruling on Exhibit 20.

[22] FED. R. EVID. 801(c).

**MEMORANDUM OPINION AND ORDER** **Page 8**

records exception. The business records exception provides that the following is not excluded by

the rule against the admission of hearsay evidence:

> **(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:
>> **(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>> **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>> **(C)** making the record was a regular practice of that activity;
>> **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>> **(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

The Fifth Circuit has ruled that—in certain circumstances—documents that are prepared

by outside entities and are then incorporated into a testifying organization's business records can

be proven up as business records by a witness from the testifying organization rather than a witness

from the outside entity that actually created the records. For example, *U.S. v. Ullrich* involved a

defendant convicted of transporting a stolen car in interstate commerce.[23] During Ullrich's trial,

the United States was able to introduce two exhibits—*i.e.*, an inventory schedule and a

manufacturer's statement of origin—through the general manager of the car dealership from which

the car the defendant was transporting had been stolen.[24] Neither of these documents were

prepared by the car dealership, but were instead prepared by the Ford Motor Company.[25] The

Fifth Circuit held that the district court had not committed an error by allowing the inventory

schedule and the manufacturer's statement of origin to be admitted as business records of the car

---

[23] 580 F.2d 765, 767 (5th Cir. 1978).

[24] *Id.* at 771.

[25] *Id.*

**MEMORANDUM OPINION AND ORDER** **Page 9**

dealership on the basis of the dealership's general manager's testimony rather than the testimony of someone from Ford.[26] The Fifth Circuit stated that "[a]lthough these documents were furnished originally from other sources, [the general manger] testified that they were kept in the regular course of the dealership's business. In effect, they were integrated into the records of the dealership and were used by it."[27] The Fifth Circuit noted that trial testimony had shown that these documents were heavily relied upon by the car dealership, and that they were accounting and title documents in the dealership's hands.[28]

Another illustrative Fifth Circuit case is *United States v. Duncan*.[29] *Duncan* involved a group of defendants who ran an insurance fraud scheme where they staged accidents to collect under insurance policies that paid out a predetermined sum of money for each day spent in the hospital.[30] A hearsay objection similar to the one in *Ullrich* was at issue. Specifically, representatives of the insurance companies proved up as business records insurance company documents that also contained medical records and statements made by doctors.[31] The Fifth Circuit held that the district court had not committed error in admitting these documents as business records despite the fact that they contained records that did not originate with the insurance company, stating that:[32]

> The insurance companies compiled their records from the business records of hospitals. Because the medical records from which the insurance company records

---

[26] *Id.* at 771-72.

[27] *Id.* at 771.

[28] *Id.* at 771-72.

[29] 919 F.2d 981 (5th Cir. 1991).

[30] *Id.* at 984-85.

[31] *Id.* at 985.

[32] *Id.* at 986.

**MEMORANDUM OPINION AND ORDER**                                    **Page 10**

were made were themselves business records, there was no accumulation of inadmissible hearsay.

There is no requirement that the witness who lays the foundation be the author of the record or be able to personally attest to its accuracy. Furthermore, there is no requirement that the records be created by the business having custody of them.

Instead, the "primary emphasis of rule 803(6) is on the reliability or trustworthiness of the records sought to be introduced." The district court has great latitude on the issue of trustworthiness. Hospitals and insurance companies rely on these records in conducting business. We hold, therefore, that the district court did not err in admitting them under Federal Rule of Evidence 803(6) upon proper authentication by their custodian.

These cases indicate that the witness who lays the foundation that documents are business records does not necessarily need to be the author of the record, be a part of the same organization as the author of the record, or be able to personally testify to the accuracy of the record.  However, a separate line of Fifth Circuit cases makes it clear that the witness laying the foundation for a business record must still have some sort of familiarity with the record keeping procedures of the business to whom the record belongs in order to qualify as a custodian or other qualified witness under Federal Rule of Evidence 803(6)(D).[33]  Thus, in *U.S. v. Brown*, the Fifth Circuit held that a district court did not err in refusing to allow an expert witness who was intimately familiar with the software used to keep a pharmacy's records to prove up the records contained in that software as business records of the pharmacy.[34]  Although the expert witness was very familiar with the operation of the software used to keep the pharmacy's records, the expert witness had no familiarity with the record keeping procedures of the particular pharmacy about which he was

---

[33] *See U.S. v. Brown*, 553 F.3d 768, 793 (5th Cir. 2008).

[34] *Id.*

**MEMORANDUM OPINION AND ORDER**                                        **Page 11**

testifying.[35] This lack of familiarity with the pharmacy's record keeping procedures meant that the expert witness could not prove up the business records.[36] Similarly, in *U.S. Commodity Future Trading Com'n v. Dizona*, the Fifth Circuit held that when a witness admitted on cross examination that she (i) did not know if a record was made at or near the time of the relevant events, (ii) did not know if the record was made by a person with knowledge, and (iii) had no information about how the record was produced, she could not prove up the record at issue as a business record.[37]

The Court finds that the facts of this case are distinguishable from *Duncan* and *Ullrich*, and that the reasoning used by the Fifth Circuit in *Brown* and *Dizona* is more applicable. While the Fifth Circuit has noted that a trial court has broad discretion when it comes to matters of admissibility or inadmissibility of evidence,[38] the elements of Federal Rule of Evidence 803(6) must still be met to the Court's satisfaction before a document may be admitted as a business record. Here, the Court is not satisfied that these elements have been met.

Donner provided detailed testimony about the role that bills of lading produced by Ever-Logistics play in Primary Freight's business, but this testimony did not demonstrate that Donner had any knowledge about how Exhibits 1 and 2 were produced or how they were kept in Ever-Logistics' records. Donner testified that Primary Freight has an "agency agreement" with Ever-

---

[35] *Id.*

[36] *Id.*

[37] *U.S. Commodity Futures Trading Com'n v. Dizona*, 594 F.3d 408, 416 (5th Cir. 2010). The Fifth Circuit also found it relevant that the witness had no experience in the kind of transactions that the record recorded. *Id.*

[38] *Mississippi River Grain Elevator, Inc. v. Bartlett & Co., Grain*, 659 F.2d 1314, 1318-19 (5th Cir. 1981); *U.S. v. Veytia-Bravo*, 603 F.2d 1187, 1189 (5th Cir. 1979).

**MEMORANDUM OPINION AND ORDER**                                              **Page 12**

Logistics, the precise scope of which remained unclear,[39] and that Ever-Logistics is located in China.[40] He testified that Primary Freight kept the bill of lading documents embodied in Exhibits 1 and 2 in the regular course of its business, that Exhibit 1 was a true and correct copy of the Ever-Logistics bill of lading, and that it was made or received at the time reflected on the documents.[41] However, on *voir dire* by Couture's counsel, Donner also testified that he did not create the bill of lading, and that it was in fact created by Ever-Logistics in China rather than by Primary Freight.[42] Donner also testified that he did not know the name of the person who prepared the bill of lading.[43]

During the offer of proof provided by Primary Freight's counsel, Donner further testified that Primary Freight uses bills of lading in all of its transactions, or about 400 to 500 transactions a day.[44] He also testified that Primary Freight has a signed agency agreement with Ever-Logistics and that the two companies have visited each other's offices and confirmed that their respective bills of lading are on file with the Federal Maritime Commission.[45] Donner also testified that he is the custodian of business records for Primary Freight, that he retrieved the bills of lading from Primary Freight's records himself, and that Primary Freight received these bills of lading from Ever-Logistics in a file pouch about a week after Primary Freight was retained.[46] Finally, Donner testified that the container numbers on the bills of lading matched those on the invoices for the

---

[39] July 6 Hr'g 12:03:30-12:04:00 (Donner) ("We have an agency agreement. Ever-Logistics and Primary Freight Services because we move traffic both ways, we have traffic coming in from them and we have traffic going out through them, to them.").

[40] July 6 Hr'g 12:03:30-12:04:00 (Donner).

[41] July 6 Hr'g 12:04:00-12:05:10 (Donner).

[42] July 6 Hr'g 12:05:10-12:07:30 (Donner).

[43] July 6 Hr'g 12:08:10-12:09:30 (Donner).

[44] July 6 Hr'g 12:37:30-12:43:45 (Donner).

[45] July 6 Hr'g 12:37:30-12:43:45 (Donner).

[46] July 6 Hr'g 12:37:30-12:43:45 (Donner).

**MEMORANDUM OPINION AND ORDER**                                  **Page 13**

Rental Charges, and that Primary Freight had been doing business with Ever-Logistics for about nine years using the same form of bill of lading.[47]

While a close question, the Court concludes that Donner's testimony did not establish that Exhibits 1 and 2 were business records of Primary Freight.  A qualified witness for the purposes of proving up a business record "is one who can explain the record keeping system of the organization and vouch that the requirements of Rule 803(6) are met."[48]  Donner's testimony did not demonstrate that he had any knowledge regarding Ever-Logistics record keeping system. Although Donner testified that Primary Freight uses bills of lading in all of its transactions and that in particular it has been working with Ever-Logistics and using its bills of lading for many years, these facts do not shed any light on how the bills of lading embodied in Exhibits 1 and 2 were produced or how they were kept in Ever-Logistics' records.  Like the witnesses in *Brown* and *Dizona*, Donner did not demonstrate that he had any knowledge of Ever-Logistics' record keeping procedures.  Nor did Donner testify that Primary Freight relies on the inherent accuracy of the bills of lading to conduct its operations, as was the case in *U.S. v. Ullrich* and *U.S. v. Duncan*.[49] Although Donner testified that Primary Freight used Ever-Logistics bills of lading in its operations, there was no testimony that led the Court to conclude that the bills of lading were "integrated into the records" of Primary Freight, as was the case in *Ullrich*,[50] or that the accuracy of the bills of lading were relied upon in conducting business as was the case in *Duncan*.[51] The simple fact that

---

[47] July 6 Hr'g 12:37:30-12:43:45 (Donner).

[48] *Dizona*, 594 F.3d at 415 (quotation marks omitted) (quoting *Brown,* 553 F.3d at 792).

[49] *Duncan*, 919 F.2d at 986; *Ullrich*, 580 F.2d at 767.

[50] 580 F.2d at 771.

[51] 919 F.2d at 985 (hospital records admissible because "[h]ospitals and insurance companies rely on these records in conducting business.").

**MEMORANDUM OPINION AND ORDER**                                    **Page 14**

Primary Freight receives many bills of lading from Ever-Logistics—without additional evidence on how those bills of lading are used in Primary Freight's business, whether their accuracy is relied upon, and how Ever-Logistics' record keeping system works—is insufficient evidence to establish that Ever-Logistics' bills of lading are Primary Freight's business records.

For all of these reasons, the business records exception to the rule against hearsay was not shown to be applicable as to Exhibits 1 and 2.

### B. Couture's Relevance Objections

Couture also objected to Exhibits 1 and 2 on relevance grounds.[52] The basis of Couture's relevance objection was that there was no evidence that Exhibits 1 and 2 had ever been sent to or received by Couture. According to Couture's counsel, if Couture had never received the bills of lading, those documents cannot be the basis of an implied-in-fact contract between Primary Freight and Couture and, as such, are not relevant evidence here.

Donner admitted on *voir dire* that he was not sure if the bills of lading embodied in Exhibits 1 and 2 had ever been sent to Couture.[53] However, when questioned about Exhibits 1 and 2, Blomfield testified that he "might have" received a bill of lading similar to Exhibit 1 without any handwriting on it, but that he didn't "recall exactly" and that he had not seen Exhibit 2 until shortly

---

[52] July 6 Hr'g 12:09:20-12:37:30. Testimony at the evidentiary hearing showed that Exhibit 2 was the back side of each bill of lading contained in Exhibit 1, and the Court took the same approach to Exhibit 2's admissibility that it had taken regarding Exhibit 1—*i.e.*, the Court sustained Couture's objections on the same bases that they were sustained for Exhibit 1 and permitted Primary Freight to make an offer of proof related to Exhibit 2. July 6 Hr'g 2:39:10-2:49:00.

[53] July 6 Hr'g 12:08:30-12:09:30 (Donner).

**MEMORANDUM OPINION AND ORDER** **Page 15**

before the hearing.[54] Blomfield further testified that "[w]e received, I believe, via e-mail, part of a bill of lading, but not a complete bill of lading" from Primary Freight.[55]

Based on Blomfield's and Donner's testimony, there is *some* evidence suggesting that Couture received Exhibit 1. However, there is no evidence in the record that Couture received Exhibit 2 during the time the business transactions occurred. Thus, the Court will overrule the relevance objection as to Exhibit 1 and sustain it as to Exhibit 2.[56]

### C. Burden of Proof

In bankruptcy, a proof of claim filed in accordance with Federal Rule of Bankruptcy Procedure 3001 is "prima facie evidence of the validity and amount of the claim."[57] This prima facie validity may be rebutted[58] by the objecting party producing evidence "of a probative force equal to that of the creditor's proof of claim."[59] However, "bankruptcy does not alter the burden imposed by the substantive law."[60] Thus, once an objecting party produces evidence or argument rebutting a proof of claim, the burden then lies with whichever party it would normally according to the relevant substantive law.[61]

---

[54] May 17 Hr'g Trans. 52:7-53:7 (Blomfield).

[55] May 17 Hr'g Trans. 51:15-52:6 (Blomfield).

[56] Although the Court excluded Exhibit 1 on hearsay grounds and Exhibit 2 on hearsay and relevance grounds, the Court notes that even if these exhibits had been admitted they would not change the outcome here. As is explained below, merely receiving notice that a party intends to add an additional charge without protesting that additional charge is insufficient to establish an implied-in-fact-contract. At best, Exhibits 1 and 2 would have provided Couture with additional notice that Primary Freight intended to hold Couture liable for the Rental Charges. However, Exhibits 1 and 2 contain no evidence indicating that Couture agreed to pay the Rental Charges.

[57] FED. R. BANKR. P. 3001(f); *see In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

[58] *Fidelity Holding Co., Ltd.*, 837 F.2d at 698.

[59] *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985); *see Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998).

[60] *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 17 (2000).

[61] *See In re 1701 Commerce, LLC*, 511 B.R. 812, 822 (Bankr. N.D. Tex. 2014); *In re Aviva America, Inc.*, 2005 WL 6441404, at *3-4 (Bankr. N.D. Tex. 2005) (quoting *In re Armstrong*, 320 B.R. 97, 102-03 (Bankr. N.D. Tex. 2005)).

**MEMORANDUM OPINION AND ORDER**                                    **Page 16**

Here, while the Original Proof of Claim is prima facie evidence of Primary Freight's claim for the Rental Charges under Federal Rule of Bankruptcy Procedure 3001, Couture has put forth evidence of a probative force equal to the Original Proof of Claim by eliciting testimony at trial indicating that there was never any agreement between Primary Freight and Couture that Couture would pay the Rental Charges. Thus, the ultimate burden to prove the existence of an agreement between Primary Freight and Couture pursuant to which Couture agreed to pay the Rental Charges falls on Primary Freight.[62] As explained below and after a careful review of the evidence, the Court concludes that Primary Freight failed in its proof. Accordingly, the Claim Objection is sustained.

## V.     LEGAL ANALYSIS

### A.     The Existence of an Implied-in-Fact Contract Between Primary Freight and Couture

Under Texas law, the elements of a contract are (i) offer, (ii) acceptance, (iii) a meeting of the minds, (iv) consent to the terms, (v) consideration, and (vi) execution and delivery of the contract with the intent that it be mutual and binding.[63] A contract implied-in-fact is simply a contract where the mutual intent to contract—*i.e.*, acceptance, meeting of the minds, and/or consent to the terms—is inferred from the facts and circumstances of the case.[64] The elements of

---

[62] *See, e.g.*, *Lewis v. Bank of America NA*, 343 F.3d 540, 545 (5th Cir. 2003) ("The elements of a breach of contract claim under Texas law are: 1) the existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) breach of the contract by the defendant; and 4) damages to the plaintiff resulting from the breach."); *Brooks v. Excellence Mortgage, Ltd.*, 486 S.W.3d 29, 36 (Tex. App.—San Antonio 2015, pet. filed) ("The elements of a breach of contract claim are "(1) a valid contract; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff was damaged as a result of the breach.") (internal quotation marks omitted).

[63] *See, e.g.*, *Burges v. Mosley*, 304 S.W.3d 623 (Tex. App.—Tyler 2010, no pet.) (discussing the element of consideration); *Plotkin v. Joekel*, 304 S.W.3d 455, 476 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[64] *See Double Diamond, Inc. v. Hilco Elec. Co-op., Inc.*, 127 S.W.3d 260, 266 (Tex. App.—Waco 2003, no pet.).

**MEMORANDUM OPINION AND ORDER**                                    **Page 17**

an implied-in-fact contract and an express contract are identical.[65] The Texas Supreme Court has recognized that "the real difference between express contracts and those implied-in-fact is in the character and manner of proof required to establish them. In each instance there must be shown the element of mutual agreement which, in the case of an implied contract, is inferred from the circumstances."[66]

Whether a promise should be inferred in a particular case is a question of fact.[67] For example, if a buyer accepts delivery of goods knowing that the goods were offered at a certain price, by accepting the goods the buyer impliedly contracts to pay that specific price for the goods.[68] The Texas Supreme Court has stressed that "a meeting of the minds is an essential element of an implied-in-fact contract."[69] Where contracts implied-in-fact are concerned, as opposed to contracts implied in law or quasi-contracts, "terms are implied not because they are just or reasonable, but rather for the reason that the parties must have intended them and have only failed to express them or because they are necessary to give business efficacy to the contract as written."[70]

The Texas Supreme Court also held in *Triton Oil and Gas Corp. v. Marine Contractors and Supply, Inc.* that, as a matter of law, when a party is unilaterally informed of a charge on an

---

[65] *Plotkin*, 304 S.W.3d at 476.

[66] *Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972) (internal citations omitted).

[67] *Id.*

[68] *See Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises*, 625 S.W.2d 295, 298 (Tex. 1981).

[69] *Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.*, 246 S.W.3d 42, 49 (Tex. 2008) (internal quotation marks omitted) (quoting *Tex. Ass'n of Counties County Gov't Risk Mgmt. Pool v. Matagorda County*, 52 S.W.3d 128, 133 (Tex. 2000)).

[70] *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009) (internal marks omitted).

**MEMORANDUM OPINION AND ORDER** **Page 18**

invoice, "mere failure to object within a reasonable time …, without more, could not establish an agreement between the parties."[71] This is because the unilateral imposition of a charge followed by silence on the part of the one being charged provides "no evidence of any conduct…indicating…acceptance of those terms."[72] Although *Triton Oil and Gas Corp.* involved a situation where the party who was being charged did not receive any benefits from the charging party after being informed of the charge, its reasoning has been extended beyond this context by the Texas Supreme Court.[73]

For example, in *Texas Association of Counties County Government Management Pool v. Matagorda County*, the Texas Supreme Court held that there was no implied reimbursement agreement between an insurer and an insured even when the insured ("**Matagorda County**") accepted a coverage benefit from its insurer ("**TAC**") after being notified by its insurer that the insurer reserved a right to seek reimbursement of that coverage benefit if it turned out the incident was not covered.[74] Specifically, Matagorda County and TAC were in the midst of litigation (the "**Declaratory Judgment Action**") regarding whether TAC was obligated to defend and indemnify Matagorda County in a lawsuit arising out of assaults that occurred in Matagorda County's jails.[75] When an opportunity to settle the jail assault lawsuits arose, TAC funded the settlement, but sent

---

[71] 644 S.W.2d 443, 445 (Tex. 1982) (citing *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 300); *see Stewart & Stevenson, LLC v. Galveston Party Boats, Inc.*, 2009 WL 3673823, at *10 (Tex. App.—Houston [1 Dist.] Nov. 5, 2009, no pet.) (mem. op.) ("Here, GPB's failure to object to Stewart & Stevenson's unilateral inclusion of an arbitration provision in an invoice reflecting the goods and services provided under an already existing contract does not establish an agreement to arbitrate between Stewart & Stevenson and GPB.").

[72] *Triton Oil and Gas Corp.*, 644 S.W.2d at 445-46.

[73] *See id.* at 446.

[74] 52 S.W.3d 128, 129-31 (Tex. 2000).

[75] *Id.*.

**MEMORANDUM OPINION AND ORDER**          **Page 19**

a reservation of rights letter to Matagorda County that specifically reserved TAC's rights to recover any payout it made if the Declaratory Judgment Action resulted in a ruling that the jail assaults were indeed not covered under Matagorda County's policy.[76] Matagorda County did not respond to the reservation of rights letter, TAC funded the settlement, and the Declaratory Judgment Action resulted in a ruling that the jail assaults were not covered under Matagorda County's policy.[77] Despite the fact that Matagorda County had received a significant benefit from TAC's funding of the settlement and that it was clearly aware of TAC's intention to seek reimbursement if there was no coverage, the Texas Supreme Court held that Matagorda County's silence in the face of the reservation of rights letter did not create an implied agreement that Matagorda County would reimburse TAC.[78]

Similarly, in *Tubelite, a Division of Indal, Inc. v. Risica & Sons*, the Texas Supreme Court held that there was no implied agreement to pay interest on past due accounts even where a purchaser of goods accepted goods from a supplier *after* he had received notice of the supplier's intention to charge interest on past due accounts.[79] This was so even though the purchaser made partial payments on his account after interest charges were added to the invoices sent to him by

---

[76] *Id.*

[77] *Id.*

[78] *Id.* at 130-33.

[79] *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 802 (Tex. 1991). Although it is not necessarily clear from a reading of the Texas Supreme Court's *Tubelite* decision, a reading of the Corpus Christi Court of Appeals decision that *Tubelite* affirms makes it clear that the purchaser in *Tubelite* received notice of the supplier's intent to charge interest on past due accounts *before* it accepted any goods from the supplier: "Tubelite sent Risica an 'acknowledgment' *followed by* the shipment of merchandise. The first page of each acknowledgment stated that 'Acceptance hereof is limited to the terms and conditions appearing on the front and reverse side hereof.' Paragraph four on the reverse side stated that 'Past due invoices will be subject to a service charge of one-and-a-half percent per month at an annual rate of 18 percent.'" *Risica & Sons, Inc. v. Tubelite, a Div. of Indal, Inc.*, 794 S.W.2d 468, 469 (Tex. App.—Corpus Christi 1990, pet. granted) (emphasis added), *aff'd*, 819 S.W.2d 801 (Tex. 1991).

**MEMORANDUM OPINION AND ORDER**                                                    **Page 20**

the supplier.[80]  A key fact in the view of the *Tubelite* court was that the purchaser had never in fact

paid the unilaterally imposed interest charges.[81]

Here, no party maintains that Couture ever signed a written contract wherein it agreed to

pay the Rental Charges.[82]  There is also no instance in any of the email communications that

Primary Freight offered into evidence where Couture or any of its representatives expressly agree

to pay the Rental Charges.[83]  Likewise, while Couture repeatedly paid invoices for a variety of

freight charges to Primary Freight,[84] Blomfield was adamant that he neither paid nor agreed to pay

the Rental Charges.[85]

---

[80] *Tubelite*, 819 S.W.2d at 805 ("After Tubelite began adding the interest charges to the statements of account, Risica made five partial payments of $2,000.00 each. The payment of interest charges is some evidence, albeit circumstantial, of the existence of an agreement to pay interest. But when the payment on the account is a partial payment that does not exceed the principal amount due, the fact of the partial payment is no evidence of an agreement to pay interest. This is because the fact of partial payment is equally consistent with either of two inferences: 1) that the payor intended to pay the interest charged because an agreement to pay interest exists or 2) the payor intended the payment to reduce only the principal amount due and not to pay the interest charged because no agreement to pay interest exists. When the circumstances are equally consistent with either of two facts, neither fact may be inferred. *Litton Indus. Products v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984). Thus, under these facts there is no evidence of a mutual intention to modify the contract to include an interest term.").

[81] *Id.*

[82] May 17 Hr'g Trans. 18:21-19:3" (Blomfield) ("Q. Well, let me start first; did you ever enter into any written contract with Primary Freight? A. No, I didn't. Q. Did you ever enter into any agreement with Primary Freight to pay the chassis rental charges – the chassis or the rental charges that are the subject of their proof of claim? A. Absolutely not."); July 6 Hr'g 3:40:30-3:41:35 (Donner) ("Q. Mr. Donner, Primary Freight never entered into an actual, written contract with Couture, isn't that correct? A. We never entered into a written contract with Couture is correct. Q. … Isn't it true that Ever-Logistics never entered into a contract with Couture either, did it? A. That's correct.").

[83] *See* Exhibits 4-7.

[84] *See* Exhibit 3 (invoices from Primary Freight marked as paid by Couture for freight charges, documentation, ISF/10+2 fees, custom clearance, and customs duty charges).

[85] July 6 Hr'g 5:20:30-5:22:19 (Blomfield) ("First of all, my agreement was with HF Collections. During that period HF Collections asked me, 'do you mind if you pay Primary Freight directly, for timing and stuff,' ok? Then I went back with Mrs. Liu, talking back and forth on the phone and emails about what costs were. Freight, maybe special customs fees, if their container had to be fumigated, whatever, right? Normal things, and in one of those conversations was the, they said they wouldn't deliver—she said she would not deliver the containers to me unless I paid for the freight, the custom fee, and a staging fee, and I said no, I'll pay the first two I will not pay that staging fee, ok? I'm not going to, that's not what we agreed on, and you dumped a bunch of containers on me. So I sent her a wire transfer through First American Title Company…and I sent her only for the—the freight and the custom fee which I had agreed to and she released the containers."); May 17 Hr'g Trans. 23:20-24:9 (Blomfield), 49:6-17 (Blomfield) ("I agreed with HF Collections…to pay custom duties, and custom charges and freight."), 53:8-17 (Blomfield) ("Q. Okay. Going

---

**MEMORANDUM OPINION AND ORDER**                                    **Page 21**

The documentary evidence bears out Blomfield's testimony. During a series of email exchanges embodied in Exhibits 4 and 6, we are able to see communications between Karen Liu ("**Liu**")—a Primary Freight employee—Blomfield, and Shaun Collins ("**Collins**"), the then president of operations at Couture, regarding a subset of the containers for which the Rental Charges were eventually charged.[86] Although Liu informs Couture of Primary Freight's intention to charge Couture for the Rental Charges on these particular containers, her assertions that Couture will be responsible for these amounts are met with silence from Blomfield and Collins.[87] The amount that Blomfield does agree to pay in these email exchanges—$12,043.78—does not include any Rental Charges.[88] This is demonstrated by the fact that the $12,043.78 amount was calculated before any Rental Charges began to accrue on the containers to which these email exchanges refer.[89] The day after Blomfield agreed to pay this $12,043.78 amount, an amount that did not

---

back, you agreed to purchase the furniture from HF. What was your understanding of who was actually going to pay the freight for this shipment? A. They were going to pay it, and then I was going to reimburse them. THE COURT: 'They' being HF? THE WITNESS: I'm sorry, Your Honor. HF Collections…I was paying them for the freight and later in the contract, Your Honor, they asked, and Primary asked if I could wire Primary directly."), 66:1-22 (Blomfield) ("Q. Mr. Blomfield, you testified, then, before you received these containers and after these containers, you've had situations where you've rented containers. Do you recall that testimony? A. Yes, I do. Q. And in each of those situations where you had those containers, did you agree to the amount of rental and chassis rental charges you were going to pay before you kept those containers? A. Yes, I did. Q. And in this instance, when you received notice of the chassis rental charges, or the charges that they were going to attempt to charge you, did you agree to those amounts? A. Absolutely not. Q. Did you do anything to agree to those amounts or say that yes you would pay those chassis rental fees? A. Nothing. Q. So let me be real specific for the record, did you, or any person employed by Couture make any agreement that Couture would agree to pay those rental charges? A. Myself, no one to my knowledge, no one in my company.").

[86] July 6 Hr'g 4:16:30-4:20:30 (Collins).

[87] *See* Exhibits 4 and 6.

[88] Exhibit 4, page 1.

[89] *See* Exhibit 3, pages 10, 11 (invoices pertaining to container numbers matching those discussed in Exhibit 4 totaling to $12,043.78); Exhibit 4 (Liu informs Blomfield that the Rental Charges will begin to accrue on these containers on either January 2, 2014 or January 3, 2014).

**MEMORANDUM OPINION AND ORDER** **Page 22**

include any Rental Charges, these containers were delivered to Couture in Dallas.[90] The fact that Primary Freight delivered the containers discussed in Exhibit 4 to Couture without first securing a promise from Blomfield to pay any Rental Charges that might be associated with the containers being discussed in Exhibit 4 indicates that even Primary Freight did not view the email exchanges embodied in Exhibits 4 and 6 as creating a contract to pay the Rental Charges at the time these emails were written.

While the email exchanges between Couture and Primary Freight establish that notice of Primary Freight's intention to charge Couture for the Rental Charges was given to Couture, they do not establish that Couture ever agreed to pay these charges. The mere failure to object to a unilaterally imposed extra charge is not enough to establish an implied agreement to pay such a charge.[91] Here, Couture did considerably more than sit in silence when Primary Freight stated that it intended to charge Couture for the Rental Charges. Blomfield testified that he specifically told Liu on the phone that he would not pay the Rental Charges.[92] Furthermore, in response to an email from Liu stating that the Rental Charges could exceed $60,000, Collins wrote back to Liu stating that: [93]

> we will not be remitting $62,670.00 for "rental fees" on these containers. We will only remit payment for what was agreed upon, per John Blomfield…This "updated bill" that you have sent is completely unwarranted. Please review your original agreement with John Blomfield to clarify what, if anything, we currently owe.

---

[90] Exhibit 4, page 1 (Blomfield agrees to pay the $12,043.78 on January 2, 2014); Exhibit 7, pages 12, 13 (documents with container numbers matching those being discussed in Exhibit 4 stating that these containers were delivered on January 3, 2014). In addition, according to Exhibit 6, Rental Charges had already been accruing for some time on containers that were not the subject of the email exchange in Exhibit 4. No mention of these charges is made when Liu speaks to Blomfield in Exhibit 4.

[91] *See Triton Oil and Gas Corp.*, 644 S.W.2d at 445 (citing *Preston Farm & Ranch Supply, Inc*, 625 S.W.2d at 300).

[92] *See* note 86, *supra*.

[93] Exhibit 6, page 4.

**MEMORANDUM OPINION AND ORDER**                                                    **Page 23**

Likewise, no evidence was submitted that there was a prior agreement to pay the Rental Charges on which Couture was reneging via Blomfield's statements on the phone or Collins' statements in his email to Liu.  Nor was there evidence of a course of dealing between Primary Freight and Couture where Couture had previously paid charges such as the Rental Charges.[94] Couture only became aware of Primary Freight's involvement in the shipping of its furniture in October 2013, two to three months before the events underlying the Original Proof of Claim occurred,[95] and the evidence does not indicate that Primary Freight and Couture engaged in many additional transactions other than the transaction in question.[96]

The Texas Supreme Court has held that—in circumstances similar to these—a mere failure to object in the face of a unilaterally imposed extra charge is not enough to create an implied contract, as long as that charge is not in fact paid.[97]  This is the case even where a party accepts a benefit after being informed of the charge.[98]  Here, Couture responded to the unilateral imposition of the Rental Charges not just with silence, but with strenuous objections.[99]  For at least these

---

[94] *See Matagorda County*, 52 S.W.3d at 132 (stating that the Texas Supreme Court's finding of an implied contract in *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enters.*, 625 S.W.2d 295, 298 (Tex. 1981) was premised on a continuing course of conduct between two merchants that included, among other things, (i) twenty separate sales transactions over the course of more than a year, (ii) receiving a statement each month containing the charge at issue, (iii) a lack of objections to the charge, (iv) continued purchases, and (v) payment of the charges) (quoting *Preston Farm & Ranch Supply, Inc*, 625 S.W.2d at 298).

[95] May 17 Hr'g Trans. 45:20-46:4 (Blomfield).

[96] *See* Exhibit 5 (email communications, arrival notices, and invoices concerning an additional transaction occurring between Couture and Primary Freight in October 2013).

[97] *Triton Oil and Gas Corp.*, 644 S.W.2d at 445-46.

[98] *See Tubelite*, 819 S.W.2d at 805; *Matagorda County*, 52 S.W.3d at 129-31.

[99] In addition to the above-discussed emails, Primary Freight also states that language in Exhibit 9 stating that "THE SHIPPER/CONSIGNEE IS RESPONSIBLE FOR ANY AND ALL ADDITIONAL CHARGES FROM THE PORT/RAIL/CFS DUE TO DELAY OF ULTIMATE DELIVERY LOCATION NOT ACCEPTING CARGO" establishes an implied-in-fact contract.  Even if the Court assumes that (i) the Rental Charges are charges falling within this language and (ii) that Couture in fact received Exhibit 9, this language would still not be enough to impose liability on Couture. Again, mere silence in the face of notice of a unilaterally imposed additional charge is not sufficient to establish contractual agreement.

**MEMORANDUM OPINION AND ORDER**                                   **Page 24**

reasons, the Court concludes that there was no implied-in-fact contract between Couture and Primary Freight for Couture to pay the Rental Charges.

### B. Primary Freight's Ability to Hold Couture Liable as a Consignee or Owner

Primary Freight has intermittently argued that Couture is liable for the Rental Charges merely because Couture was the ultimate beneficial owner of the cargo (*i.e.*, the furniture) that was being shipped. However, during closing arguments, counsel for Primary Freight waived this argument.[100] To the extent that this ultimate ownership argument sets forth a different basis of liability than implied-in-fact contract, the Court concludes that Primary Freight may not make this argument because it was (i) waived by Primary Freight, (ii) precluded by the Court's oral ruling on the Motion to Amend, and/or (iii) not supported by the evidence in the record, all as explained below.

In support of the argument that Primary Freight could be held liable as the ultimate beneficial owner of the furniture being shipped, Primary Freight cites a line of cases indicating that a consignee[101]—and in some cases the ultimate owner—of cargo may be held liable for demurrage charges such as the Rental Charges. According to the Fifth Circuit, "[d]emurrage charges are in the nature of a penalty that is assessed against railroads and shippers alike in order to promote prompt loading and unloading of cars. Frequently, demurrage is assessed and liability attaches although the delay is not caused by the assessed party."[102] Indeed, a review of cases

---

[100] July 6 Hr'g 3:02:45-3:05:15 ("THE COURT: The only argument that you've got is implied-in-fact contract, listening check, and it should be implied in fact from emails and the Exhibit 9 arrival notices and invoices, yes? HOODENPYLE: Yes, Your Honor, and Exhibit, well, I, my position is that Exhibit 5 and Exhibit 9 kind of go hand in hand because they both gave notice….THE COURT: Ok. No other theory of liability? That's it? HOODENPYLE: We would go with *quantum meruit*, but that was… THE COURT: Correct. HOODENPYLE: That's it, Your Honor.").

[101] The parties agree that Couture was not the consignee named on the bills of lading here.

[102] *Port Terminal R. R. Ass'n v. Connell Rice & Sugar Co.*, 387 F.2d 355, 357 (5th Cir. 1967).

**MEMORANDUM OPINION AND ORDER**                                    **Page 25**

concerning demurrage shows that liability for demurrage charges is often imposed on the basis of a publically posted tariff. Liability under theses tariffs is not exactly contractual. As the Fifth Circuit stated:

> filed tariffs have the force of law and establish the liability of a recipient of services covered by the tariff, even if the recipient was quoted a different price or was party to a contract under which the services were to be provided at a different price. A carrier cannot waive or modify legally applicable tariffs.[103]

As noted above, liability under tariffs is often in the nature of a penalty.[104] Although testimony at the evidentiary hearing hinted that the transactions at issue may be subject to a tariff, no specific tariff has been brought to the Court's attention and thus this argument is irrelevant here and is unsupported by the evidence in the record.

Some cases concerning demurrage indicate—in dicta—that demurrage charges may be imposed against the owner of the property being shipped as a matter of course. For example, both the Eleventh and the Seventh Circuits have stated that ""liability for freight charges may be imposed only against a consignor, consignee, *or owner of the property*, or others by statute, contract, or prevailing custom.""[105] No party disputes that Couture was the ultimate owner of the furniture being shipped here. Another prominent case discussing demurrage states that liability for demurrage can be imposed on parties to the shipping contract.[106] No shipping contract both pertaining to the containers at issue and naming Couture has been produced here.

---

[103] *Illinois Cent. Gulf R. Co. v. Golden Triangle Wholesale Gas Co.*, 586 F.2d 588, 592 (5th Cir. 1978).

[104] *Houston Belt & Terminal R. Co.*, 411 F.2d at 1222.

[105] *Norfolk Southern Ry. Co.*, 586 F.3d at 1278 (emphasis added) (internal marks omitted) (quoting *Evans Prods. Co. v. Interstate Commerce Comm'n*, 729 F.2d 1107, 1113 (7th Cir. 1984)).

[106] *Middle Atlantic Conference v. U.S.*, 353 F. Supp. 1109 (D. D.C. 1972).

**MEMORANDUM OPINION AND ORDER**                                    **Page 26**

The theory of the owner's liability for demurrage in the above cases is not clear. According to at least the Eleventh Circuit, liability for demurrage can be quasi-contractual[107] or contractual.[108] According to the Fifth Circuit, liability for demurrage is a penalty.[109] To the extent that the theory of liability under these cases is contractual, the Court's analysis above finding that there was no agreement between Couture and Primary Freight for Couture to pay the Rental Charges applies. Alternatively, to the extent that the theory of demurrage liability is based on quasi-contract, unjust enrichment, or other implied-in-law contract theories, the Court's reasoning in its oral ruling on the Motion to Amend disposes of all of these theories to the same extent that it governs *quantum meruit*, and thus Primary Freight may not argue on these quasi-contractual bases here. To the extent that these cases hold that owners can be liable for demurrage as a matter of course because demurrage is a penalty, Primary Freight has waived this argument. As the Fifth Circuit has stated, "a district judge must be able to winnow the issues for trial. This includes reliance on statements made by counsel in open court disavowing specific claims."[110] Here, Primary Freight specifically stated in open court that its only theory of liability was an implied-in-fact contract.[111]

## C.    Couture's Other Arguments

Couture argued that it should not be liable for the Rental Charges on two other bases that the Court does not reach. First, it argued that the Rental Charges are akin to a liquidated damages

---

[107] *Norfolk Southern Ry. Co.*, 586 F.3d at 1273-82.

[108] *Id.* at 1278-81.

[109] *Houston Belt & Terminal R. Co.*, 411 F.2d at 1222.

[110] *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 599–600 (5th Cir.1996).

[111] July 6 Hr'g 3:02:45-3:05:15 ("THE COURT: The only argument that you've got is implied-in-fact contract, listening check, and it should be implied in fact from emails and the Exhibit 9 arrival notices and invoices, yes? HOODENPYLE: Yes, Your Honor, and Exhibit, well, I, my position is that Exhibit 5 and Exhibit 9 kind of go hand in hand because they both gave notice….THE COURT: Ok. No other theory of liability? That's it? HOODENPYLE: We would go with *quantum meruit*, but that was… THE COURT: Correct. HOODENPYLE: That's it, Your Honor.").

**MEMORANDUM OPINION AND ORDER**                                              **Page 27**

clause that operates as a penalty rather than compensation; and thus, the Rental Charges are unenforceable as a part of any contract to which the Court might conclude Couture is a party. Since the Court concluded that there was no contract between Couture and Primary Freight, there is no need to address whether the Rental Charges operate as compensation or as an impermissible penalty under any hypothetical contract between Primary Freight and Couture.  Couture also argued that if there was a contract between Couture and Primary Freight to pay the Rental Charges, the Court should take into account the fact that Primary Freight caused the delay in unloading the containers that in turn caused the Rental Charges to be assessed.  Since the Court has found that Couture is not liable for the Rental Charges because there was no contract between Couture and Primary Freight, it need not reach this additional argument either.

## VI.    CONCLUSION

For at least the reasons stated above, the Court concludes that there was no contract—express or implied—between Couture and Primary Freight pursuant to which Couture agreed to pay the Rental Charges that comprise the Original Proof of Claim.  For this reason, the Claim Objection is sustained and the Original Proof of Claim is disallowed.

**SO ORDERED**.

**### End of Memorandum Opinion and Order ###**